Noreen BOOMSMA, as personal representative of the Estates of Thomas G. Boomsma, deceased, and Chelsea Boomsma, deceased; June Caplinger, as personal representative of the Estate of Sharon L. Boomsma, deceased; and Thomas J. Parins, as Special Administrator of the Estate of James A. Spencer, deceased, Plaintiffs,

v.

STAR TRANSPORT, INC. and Charles I. Bennett, Defendants & Third–Party Plaintiffs,

v.

Stephanie Hansen, Fairwater Garage, Inc., and Auto Owners Insurance Company, Third–Party Defendants.

Nos. 99–C–895, 99–C–896.

United States District Court,
E.D. Wisconsin.

May 14, 2002.

Edmund J. Scanlan, Scanlan Law Office, Chicago, IL, for Plaintiffs.

Paul J. Pytlik, Hills Legal Group, Waukesha, Elliott R. Schiff, Jill B. Lewis, Schiff Gorman & Krkljes, Chicago, IL, for Defendants.

## DECISION AND ORDER

RANDA, District Judge.

These actions come before the Court on a Rule 60(b) motion by the plaintiffs for relief from the Court's Orders of June 26, 2001 and March 7, 2002 as they relate to "choice of law." Specifically, the plaintiffs assert that Illinois law applies to their wrongful death damages claims against defendants Star Transport, Inc. ("Star") and Charles I. Bennett ("Bennett"). In the event the Court decides that Wisconsin law applies, the plaintiffs ask the Court to certify an interlocutory appeal of the choice-of-law issue pursuant to 28 U.S.C. § 1292(b). Also before the Court are a number of motions in limine, including a motion by Star and Bennett that would bar evidence or argument in support of the plaintiffs' claim for punitive damages.

For the reasons set forth below, the Court denies both the plaintiffs' motion for relief and their request for certification of an interlocutory appeal. In addition, the Court finds that there is insufficient evidence of malicious or intentional conduct on the part of either Star or Bennett to submit the question of punitive damages to a jury under Wis. Stat. § 895.85(3). The

remaining motions in limine are addressed in Part IV of this opinion.

## BACKGROUND

These actions arise from a tragic accident that occurred near Fond du Lac, Wisconsin in the Fall of 1996, claiming the lives of five Wisconsin residents: Thomas G. and Sharon Boomsma, their children, Chelsea and Owen (collectively "Boomsmas"), and a young man named James Spencer ("Spencer"). At approximately 7:15 AM on September 23, 1996, a semi-trailer truck hit the Boomsmas' car and a school bus from behind. The Boomsmas and their children were killed, along with Spencer, who was a passenger in the rear of the school bus. Defendant Bennett, the driver of the semi-trailer truck, was employed at the time of the accident by defendant Star. As discussed below, Bennett was domiciled in Illinois at the time of the accident and Star was a citizen of Illinois. Bennett was hauling a load of steel from Morton, Illinois to Hortonville, Wisconsin at the time of the collision.

Star and Bennett have asserted contributory negligence claims against the operator of the school bus, Stephanie Hansen ("Hansen"), the school bus owner, Fairwater Garage, Inc. ("Fairwater"), and Fairwater's liability carrier, Auto Owners Insurance Company ("Auto Owners"). These parties were all domiciled in Wisconsin at the time of the accident. On November 18, 1999, the claims against Hansen, et al. ("third-party claims") were consolidated with the action brought by the representatives of the Boomsma and Spencer estates.

On June 14, 2001, Judge Reynolds addressed Star and Bennett's motion for partial summary judgment, which sought the dismissal of the plaintiffs' claims for wrongful death damages under Illinois law. Judge Reynolds analyzed the relevant choice-of-law factors at length and conclud-

ed that "it appears that Wisconsin has a more substantial relationship to this action than Illinois." However, Judge Reynolds believed that the record was insufficiently developed to permit a determination with respect to one of the factors: where the injury-causing conduct occurred. Accordingly, he decided to hold the defendants' motion for partial summary judgment in abeyance and make a determination concerning choice of law "after all the evidence has been presented at trial."

A pre-trial/settlement conference with the parties in June of last year persuaded Judge Reynolds that there was no reason to postpone a decision respecting choice of law. Therefore, on June 26, 2001, Judge Reynolds granted the defendants' motion for partial summary judgment and dismissed all claims brought under Illinois law.

The consolidated actions were assigned to this branch of the Court on June 26, 2001. The Court decided various issues relating to the admissibility of expert witness testimony on March 7, 2002. In addition, the Court's March 7, 2002 opinion addressed the scope of Noreen Boomsma's claims. Analyzing Wis. Stat. § 895.04, the Court concluded that Noreen Boomsma (Chelsea and Owen's grandmother), lacked standing to pursue a claim for loss of society and companionship with respect to either grandchild and that her claim on behalf of Chelsea's estate would be limited to a claim for conscious pain and suffering. This aspect of the Court's March 7, 2002 opinion rested on the assumption that Judge Reynolds had correctly decided the choice-of-law issue.

In response to the Court's March 7 decision, the plaintiffs filed the instant motion for relief under Rule 60 [276–1]. The plaintiffs argue that Illinois law should govern their wrongful death damages claims against Star and Bennett and that

accordingly both Judge Reynolds' June 26, 2001 decision and the portion of the Court's March 7 order limiting Noreen Boomsma's claims should be vacated. The Court ordered briefing on the plaintiffs' motion, over the objection of Star and Bennett that the Rule 60 motion was untimely.

Additional facts and procedural history will be discussed as necessary below.

## DISCUSSION

### I. MOTIONS UNDER F.R.C.P. 60(b)

■ Rule 60(b) provides a district court with the discretion to afford relief from a judgment or order under certain specified circumstances. *Talano v. Northwestern Medical Faculty Foundation, Inc.*, 273 F.3d 757, 762 (7th Cir.2001). The plaintiffs' motion rests upon the residual provision in Rule 60(b)(6) that authorizes relief for "any other reason justifying relief from the operation of the judgment." Relief is available pursuant to 60(b)(6) only in "exceptional circumstances." *Williams v. Hatcher*, 890 F.2d 993, 995 (7th Cir.1989) (quotation omitted); *see also* 11 Charles A. Wright, et al., FEDERAL PRACTICE & PROCEDURE §§ 2864, at 357–76 (2d ed.1995).

### II. CHOICE OF LAW

#### A. General Principles

#### 1. *The "Most Significant Relationship" Test*

■ Illinois courts [1] apply the "most significant relationship" test of the RESTATEMENT (SECOND) OF CONFLICTS OF LAWS to determine the applicable law in wrongful death actions. *In re Air Crash Near Chicago*, 644 F.2d 594, 611 (7th Cir.), *cert denied*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981); *see also Ingersoll v. Klein*, 46 Ill.2d 42, 262 N.E.2d 593, 596 (1970). The RESTATEMENT provides two sets of criteria for determining which state has the most significant relationship to the occurrence and the parties. *Air Crash*, 644 F.2d at 611. The first set of criteria "includes general factors such as the needs of the interstate system; relevant policies of the forum and other interested states; protection of justified expectations; the basic policies underlying the particular field of law; certainty, predictability, and uniformity of result; and ease in the determination and application of the law to be applied." *Id.* (citing RESTATEMENT § 6). The second and more specific set of criteria, found in Section 145 of the RESTATEMENT, provides a list of "contacts" that should be taken into account by the court. These are:

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.

RESTATEMENT § 145. These factors "are to be evaluated according to their relative importance with respect to the particular issue." *Id.*

Although Illinois no longer follows the simpler rule of *lex loci delicti*, the place where the injury occurred remains the single most important factor in applying the "most significant relationship" test. "[I]n the absence of unusual circumstances, the highest scorer on the 'most significant relationship' test is—the place where the tort

---

1. The defendants and third-party defendants each note that there are arguments to be made in favor of applying Wisconsin's choice-of-law rules. However, especially since Illinois and Wisconsin choice-of-law judicial decisions "seem roughly in accord" (as the third-party defendants note), the Court sees no reason to re-visit this aspect of Judge Reynolds' decision concerning choice of law.

occurred." *Spinozzi v. ITT Sheraton*, 174 F.3d 842, 844 (7th Cir.1999). Most often this is expressed in the form of a presumption that favors the law of the place where the injury occurred. *See Air Crash*, 644 F.2d at 616 (Illinois' choice-of-law rules give "presumptive importance to the place of injury."). In the *Ingersoll* case, for example, the Illinois Supreme Court stated that "the local law of the State where the injury occurred should determine the rights and liabilities of the parties, *unless* Illinois has a more significant relationship with the occurrence and with the parties .... " 262 N.E.2d at 595 (emphasis added). Similarly, Sections 175 and 178 of the RE-STATEMENT provide:

> § 175. RIGHT OF ACTION FOR DEATH
>
> In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship ... to the occurrence and the parties, in which event the local law of the other state will be applied.
>
> § 178. DAMAGES
>
> The law selected by application of the rule of § 175 determines the measure of damages in an action for wrongful death.

RESTATEMENT, §§ 175 & 178. The commentary accompanying Section 175 suggests that it will be a "relatively rare situation" in which a "state other than that where the injury occurred" has the most significant relationship to the occurrence and the parties. *Id.* (cmt.(d), emphasis added). The commentary also explains that the presumption embodied in Section 175 "furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the state where the injury occurred will usually be readily ascertainable, of ease in the determination and application of the applicable law." *Id.*

### 2. *"Dépeçage"*

As noted in the Court's April 10, 2002 order, "dépeçage" is a French word for "dismemberment." BLACK'S LAW DICTIONARY 448 (7th ed.1999). In this context, dépeçage refers to the process of determining choice of law on an issue-by-issue basis (versus a "blanket approach"). As the Seventh Circuit noted in *Ruiz v. Blentech Corp.*, 89 F.3d 320 (7th Cir.1996), *cert denied*, 519 U.S. 1077, 117 S.Ct. 737, 136 L.Ed.2d 677 (1997), dépeçage is the approach embodied in the RESTATEMENT. The plaintiffs urge the Court to apply the concept of dépeçage and rule that (1) Illinois law will govern their wrongful death damages claims against defendants Star and Bennett; and (2) Wisconsin law will govern their punitive damages claims.[2] Dépeçage permits, but does not necessarily require, the application of different local law to different issues within a case. Thus, it is possible to analyze the wrongful death damages issue separately (as Judge Reynolds failed to do) and nevertheless agree with Judge Reynolds that on all issues Wisconsin has the most significant relationship to the occurrence and the parties.

### B. Wrongful Death Damages Claims Against Star & Bennett

The Court begins by identifying the conflict of laws. The version of the Wisconsin Wrongful Death Act that was in effect at the time of the accident limits non-economic damages to $150,000 per person. Wis. Stat. § 895.04(4) (1995–1996); *see also*

---

2. The parties agree that Wisconsin law should govern the plaintiffs' claim for punitive damages and likewise the third-party claims against Hansen, Fairwater and Auto Owners.

Accordingly, the Court will focus on which state's law should apply to the plaintiffs' wrongful death damages claims.

*Neiman v. American Nat'l Prop. & Cas. Co.*, 236 Wis.2d 411, 613 N.W.2d 160, 164 (2000). Illinois law contains no such limitation.[3] The plaintiffs have therefore shown an understandable persistence in seeking to avoid the application of Wisconsin law with respect to wrongful death damages. The Court will now turn to the relevant RESTATEMENT factors to determine, with respect to this issue, which state has the most significant relationship to the occurrence and the parties.

### 1. *Where Did The Injury Occur?*

█ It is undisputed that the accident giving rise to this lawsuit occurred in the State of Wisconsin. Although the Seventh Circuit has recently emphasized the pre-eminent importance of the place of the injury, *Spinozzi*, 174 F.3d at 844 (except in "unusual circumstances"), the plaintiffs urge the Court to disregard this factor altogether, citing *Air Crash*, 644 F.2d at 615. As its name suggests, this case arose from the crash of a Los Angeles-bound DC–10 aircraft shortly after take-off from O'Hare International Airport in Illinois. In that particular factual context, the Seventh Circuit believed that the place of injury was "fortuitous" and therefore not to be assigned as much importance as other factors under the "most significant relationship" test. *Id.* The instant case is clearly distinguishable. An airplane flies high above the earth. When it crashes, the place where it actually comes to rest depends on the speed of the craft, its trajectory, the nature and timing of the accident, prevailing winds, and so on. In the case relied upon by the plaintiffs, because the airplane was supposed to fly from Chicago to L.A., the Court observed that "had the DC–10's engine fallen off

later, the injury might have occurred in one of any number of states." *Id.* There was, in other words, an element of fortuity, or chance, in the fact that the plane crashed in Illinois as opposed to some other state along the route. The same cannot be said of the accident in this case. Bennett was driving an earth-bound vehicle along a foggy patch of road near Fond du Lac, Wisconsin. He was headed for a destination in Wisconsin and was nowhere near any of the state's borders when the accident took place. It is not alleged that some latent defect existed in the truck, which might have caused an accident in any one of several states. In short, this case is distinguishable from *Air Crash*. There are no "unusual circumstances" that render the place of the accident fortuitous and thus insignificant for choice-of-law purposes. As far as the Court is concerned, therefore, the place of the accident remains the "highest scorer" on the most significant relationship test. *Spinozzi*, 174 F.3d at 844.

### 2. *Where Did The Injury–Causing Conduct Occur?*

Although the accident occurred in Wisconsin, allegedly as a consequence of Bennett's negligence in "fail[ing] to adjust the speed of [his] motor vehicle to the weather and visibility conditions that existed at the time of the collision," Amended Complaint, ¶ 12, the plaintiffs also assert that negligent conduct occurring in Illinois was a "substantial factor" in causing the decedents' injuries. Specifically, they maintain that Star "directed," "permitted" and/or "urged" Bennett to operate his semi-trailer on September 23, 1996 in violation of federally-mandated hours-of-service regulations and/or in a fatigued condition. *Id.*

---

3. In addition, the plaintiffs argue that there is a "more subtle" conflict between Wisconsin law and the Federal Motor Carrier Safety Act, 49 U.S.C. § 30101, *et seq.* The Court does not find this alleged conflict significant for purposes of determining whether to apply Wisconsin or Illinois law. *See* Decision and Order of June 14, 2001, p. 12 n. 6.

The facts adduced by the defendants show that: (1) Star customarily determined whether a driver had been on duty in excess of 70 hours in an 8–day period by auditing logs submitted by the driver,[4] (2) Star took disciplinary action with respect to the hours-of-service violations that it *did* know about (*i.e.,* those occurring during August of 1996, Bennett's first month on the job), and (3) Bennett submitted his log for the week of September 14—September 22 on Saturday, September 21, 1996. The significance of the last fact (3) is that no one was on duty over the weekend to audit Bennett's logs. In other words, Bennett departed on his fateful trip to Wisconsin before any auditing of the logs could take place. Thus, Star could not have directed, permitted or urged Bennett to drive in violation of the regulations. Similarly, the defendants note a dearth of evidence that anyone at Star observed Bennett in a fatigued condition when he left Morton, Illinois very early on the morning of the 23rd.

▪ Since the choice-of-law question originally came before Judge Reynolds on a motion for summary judgment, and since the plaintiffs are the proponents of Illinois law, it is their burden to come forward with evidence creating a genuine factual issue as to whether injury-causing conduct occurred in Illinois. The plaintiffs claim to have met this burden by placing in the record "numerous evidentiary materials indicating that Star dispatched Bennett from Illinois when he was over the federally

mandated hours of service including the date of this crash, and that this led to fatigue that caused the crash." In reality, the plaintiffs' argument does not rest on "numerous evidentiary materials" but on the testimony of three experts: Thomas Corsi ("Corsi"), Mark Mitler ("Mitler"), and Forrest Baker ("Baker"). Corsi's testimony has been disallowed by the Court because his opinions lack the rigor required under *Daubert.* The affidavits of Mitler and Baker are problematic for a number of reasons, not the least of which is that these experts are now attempting to contradict their prior sworn testimony on the question of whether injury-causing conduct occurred in Illinois.[5] The about-face of Mitler, the plaintiffs' sleep expert, is particularly flagrant. During his deposition, the following exchange took place:

Q: Do you agree that [Bennett] may have been fully alert when he left Morton, Illinois and not fatigued, and then by the time he drove from Morton, Illinois to Keystone and then Keystone back to Morton, Illinois and then Morton Illinois to the location where the accident took place in Rosendale, Wisconsin, that he might have developed some level of fatigueness [sic]?

A: *Yes, that's possible.*

Q: All right.

A: *It's very possible. It's likely.*

Deposition of Mark Mitler ("Mitler Dep."), p. 89 (emphasis added). In his affidavit, Mitler now opines that Bennett "was suf-

---

4. Plaintiffs, citing the deposition testimony of defense expert Carmen W. Daecher ("Daecher"), argue that Star should have monitored hours-of-service on the basis of daily e-mails submitted by Bennett that included his hours of service. However, Daecher's testimony suggests that this would have been an imperfect means, at best, of calculating whether a driver was in violation of federal regulations. Deposition of Carmen W. Daecher ("Daecher Dep."), pp. 278–279.

5. These affidavits were also made after the time to file written export reports, after the close of discovery, and after the time to submit contested and uncontested facts. *See* Reply to Plaintiffs' Response to Defendants' Motion for Partial Summary Judgment, pp. 1–3. Indeed, to some extent the affidavits appear to have been used in lieu of the process provided in L.R. 6.05(b)(1) (the predecessor to Civ. L.R. 56.2). *Id.*

fering from sleep deprivation and fatigue *when he departed from Star in Illinois* on September 23, 1996." Affidavit of Mark Mitler ("Mitler Aff."), ¶ 15 (emphasis added). The basis for this new opinion is not clear.[6] It is obvious that the plaintiffs are attempting to "repair" their experts' deposition testimony by coming forward with affidavits more in line with their choice-of-law arguments.[7] This is improper. As a general rule, "the law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict prior deposition or other sworn testimony." *EEOC v. Yellow Freight System,* Inc., 253 F.3d 943, 952 (7th Cir.2001) (en banc); *see also Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). Accordingly, the Court grants the defendants' motion to strike the affidavits of Mitler and Baker [286–1]. The Court also concludes that there is insufficient evidence of injury-causing conduct occurring in Illinois to warrant the assumption that Illinois law should govern the plaintiffs' wrongful death damages claims. Even if some negligent conduct *did* occur in Illinois, the Court agrees with the defendants that for choice-of-law purposes such conduct "neither outweighs the acts or omissions in Wisconsin nor overwhelms the presumption that the State where the injury takes place has the most significant relationship."

### 3. *Where Are The Relationships Of The Parties Centered?*

The Court attaches comparatively little importance to this factor because, as the plaintiffs correctly note, "there was no [pre-injury] relationship between the decedents and Star and Bennett." *See* Restatement § 145, cmt. subsection (2) ("When there is a relationship between the plaintiff and the defendant and *when* the injury was caused by an act done in the course of the relationship, the place where the relationship is centered is another contact to be considered.").

### 4. *The Domiciles Of The Parties*

The decedents in this action were all domiciled in Wisconsin at the time of the accident. The plaintiffs, however, argue that only the *defendants'* domiciles are relevant *to the issue of whether to limit damages for wrongful death.* This argument finds support in *Mitchell v. United Asbestos,* 100 Ill.App.3d 485, 55 Ill.Dec. 375, 426 N.E.2d 350, 358–59 (1981). In *Mitchell,* the court noted that the purpose of a damages cap was "to protect *resident defendants* from excessive financial burdens." *Id.* (emphasis added). The domicile of the plaintiffs (who resided in the state with the cap) bore "no relationship" to this purpose. *Id.* Accordingly, the *Mitchell* court found that the residency of the defendants was the "only significant contact" with respect to the damages limitation issue. *Id.* Similarly, since defendants were domiciled in Illinois at the time of the accident, the plaintiffs argue that Star and Bennett should not enjoy the protection of Wisconsin's cap on wrongful death damages. Also, the plaintiffs argue that the Court must consider Illinois' interest in deterring tortious conduct by its own domiciliaries. *Id.* at 359; *see also*

---

6. Bennett left Morton, Illinois around 12:15 or 12:30 AM on September 23, 1996. The accident in Wisconsin did not occur until roughly seven hours later. Thus, as Mitler originally conceded, it seems more likely that fatigue developed (if at all) sometime after Bennett crossed into Wisconsin.

7. Baker's affidavit and his deposition testimony are also in conflict. *See* Affidavit of Forrest Baker ("Baker Aff."), ¶ 62; Deposition of Forrest Baker ("Baker Dep."), pp. 274–275.

RESTATEMENT § 6(c) (courts should consider "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue.").

■ The Seventh Circuit has observed that "critical to conflicts analysis is the notion that we must examine the choice-of-law rules not with regard to the various states' interests in general, but precisely, with regard to each state's interest *in the specific question* [before the court]." *Air Crash*, 644 F.2d at 611 (emphasis added). The plaintiffs' arguments are consistent with this approach. Admittedly, Wisconsin does not have an interest in limiting damage awards against out-of-state defendants. However, the fact remains that the third-party defendants are all domiciled in Wisconsin and have a strong (perhaps even a constitutionally-protected) [8] interest in the application of Wisconsin law. "Dépeçage" notwithstanding, the claims and third-party claims in this action are, as the defendants note, "inextricably intertwined." Applying Illinois law to the underlying claims and Wisconsin law to the third-party claims would be both unworkable and unfair. As the third-party defendants observe in their brief, "it would seem almost impossible to concomitantly protect [the third party defendants'] domiciliary rights and allow plaintiff[s] to collect Illinois-type damages," since "the percentage of causal negligence eventually attributed to the third-party defendants will be measured in dollars." For example, if the plaintiffs recover one million dollars worth of "Illinois-type damages," and the third-

party defendants are adjudged 50% at fault, the third-party defendants are on the hook for half a million dollars, instead of the $75,000 maximum permitted under Wisconsin law. This would be manifestly unfair to the third-party defendants, all Wisconsin domiciliaries, who have a justified expectation of limited liability. On the other hand, if the third-party defendants are afforded the protection of Wisconsin law and their liability is limited to $75,000, is it fair to subject the defendants, who are only 50% at fault under this hypothetical, to a judgment of $925,000? The plaintiffs have left these difficult questions unanswered. Therefore, although there would be persuasive arguments in favor of Illinois law if this case did not involve third-party claims against Wisconsin domiciliaries, the Court agrees with Judge Reynolds that the third-party claims cannot be ignored. In light of the presence of the third-party defendants, the "domiciles of the parties" factor favors the application of Wisconsin law.

### 5. *Conclusions*

With respect to the plaintiffs' wrongful death damages claims, two of the three relevant RESTATEMENT factors favor Wisconsin as the state with the most significant relationship to the occurrence and the parties. The third relevant factor—"domiciles of the parties"—presents a closer question, but the Court resolves this question in favor of Wisconsin law for the reasons discussed above.[9] The plaintiffs have failed to overcome the presumption

---

8. An existing cause of action is regarded in Wisconsin as a vested right protected by the due process guarantee. *Hunter v. School District*, 90 Wis.2d 523, 280 N.W.2d 313 (1979), *aff'd*, 97 Wis.2d 435, 293 N.W.2d 515 (1980). The third-party defendants argue persuasively that "although [they] are the object, not the subject, of a claim, there is no reason to treat any differently [their] vested right to [the]

protection afforded by the Wisconsin statutory cap."

9. Even if this were the *only* relevant factor, as plaintiffs argue, the Court could not disregard the third-party claims against Wisconsin domiciliaries. As explained above, these claims are inextricably intertwined with the underlying claims against Bennett and Star.

that favors the law of the place where the injury occurred. Likewise, for purposes of Rule 60, they have failed to show "exceptional circumstances" warranting relief from the Court's earlier choice-of-law rulings. *Williams*, 890 F.2d at 995.

One last point, touched upon briefly by the defendants, is that the plaintiffs had no "justified expectation" that Illinois' law would apply to their claims. RESTATEMENT § 6(2)(d). Indeed, application of Illinois law to the plaintiffs' wrongful death damages claims would endorse a kind of lottery system for Wisconsin plaintiffs who are injured in Wisconsin. The "winners" of the lottery would be those injured by tortfeasors from other states that do not cap wrongful death damages. The "losers" would be those injured by fellow Wisconsin-ites, against whom recovery is limited. Such a system would undermine certainty, predictability and uniformity of result. *Id.*, § 6(f).

## C. Certification Of An Interlocutory Appeal Under Section 1292(b)

In considering the plaintiffs' request for interlocutory review, the Court is mindful that the law disfavors "piecemeal appellate review of trial court decisions which do not terminate the litigation." *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 265, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982). Interlocutory appeal under Section 1292(b) is "used sparingly, in exceptional cases." 16 FEDERAL PRACTICE & PROCEDURE § 3929, at 365; *see also Baranski v. Serhant*, 602 F.Supp. 33, 36 (N.D.Ill.1985). To demonstrate that interlocutory review under Section 1292(b) is appropriate, the movant must show that the district court's ruling involves "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).[10]

With respect to the choice-of-law issue, the plaintiffs have failed to address the specific statutory criteria for certification. However, they do appeal to judicial efficiency by arguing that this case "should only be tried once and with the proper substantive laws." Implicit in Section 1292(b) is a directive to consider the "probable gains and losses of immediate appeal." FEDERAL PRACTICE & PROCEDURE § 3929, at 416. The advantages of immediate appeal increase with a number of factors, including the "length of the district court proceedings saved by reversal of an erroneous ruling." *Id.* On the other hand, if the trial of the case can be had in a few days, "the possibility of saving relatively small amounts of trial court time is not thought sufficient to justify immediate appeal." *Id.* at 434; *see also Cardwell v. C & O Railway Co.*, 504 F.2d 444, 446 (6th Cir.1974) (Section 1292(b) "was not intended to authorize interlocutory appeals in ordinary suits for personal injuries or wrongful death that can be tried and disposed of on their merits in a few days."). Today's ruling disallowing evidence or argument in support of the plaintiffs' punitive damages claim[11] will significantly shorten the length of this trial, originally scheduled to last three weeks. Also, the defendants have stipulated that if Wisconsin law applies "the pecuniary loss for Sharon Boomsma, Thomas Boomsma and James Spencer is the statutory limit and accordingly evidence regarding the relationship along with monies, goods and services lost

---

**10.** A question of law may be "controlling" if its resolution "is quite likely to affect the further course of the litigation, even if not certain to do so." *Sokaogon Gaming Enter-* *prise Corp. v. Tushie–Montgomery Associates, Inc.*, 86 F.3d 656, 659 (7th Cir.1996).

**11.** See *infra*, Part III.

becomes unnecessary." Star & Bennett's Pre–Trial Report, p. 34.[12] In short, since it appears the trial will last a matter of days (not weeks), the only proferred rationale for certification of an immediate appeal (saving trial time) is no longer very compelling.

Lastly, given the posture of this case, an immediate appeal will not "materially advance the ultimate termination of th[is] litigation." Discovery has been concluded. Motions in limine have been filed. The case is ready for trial. If the choice-of-law issue were certified for interlocutory appeal, and a stay granted under Section 1292(b), trial would be postponed for an indefinite period. In short, certification under Section 1292(b) would only postpone the ultimate termination of this litigation, which has already been significantly delayed by the transfer of the case from Judge Reynolds to the undersigned District Judge. " '[Avoiding] [d]elay is a particularly strong ground for denying appeal if certification is sought from a ruling made shortly before trial.' " *Kapossy v. McGraw–Hill, Inc.*, 942 F.Supp. 996, 1004 (D.N.J.1996) (quoting *Baranski, supra*); *see also Singh v. Daimler–Benz, AG*, 800 F.Supp. 260, 263 (E.D.Pa.1992), *aff'd*, 9 F.3d 303 (3rd Cir.1993); *Edwards v. Nat'l Audubon Society, Inc.*, 411 F.Supp. 744 (S.D.N.Y.1976).

For all of these reasons, the Court declines to certify an immediate appeal under Section 1292(b).

## III. PUNITIVE DAMAGES

### A. Punitive Damages In Wisconsin

■ Before the question of punitive damages can be submitted to a jury, the court must determine, as a matter of law, that there is sufficient evidence to support an award of punitive damages. *Sharp v. Case Corp.*, 227 Wis.2d 1, 595 N.W.2d 380,

389 (1999). As a consequence of the enactment in 1995 of Wis. Stat. § 895.85, Wisconsin is now "among the states having the most stringent punitive damage conduct requirements." R. Blatt et al., PUNITIVE DAMAGES 326–27 (2001 Supp.). Prior to the passage of this statute, the common law standard governing awards of punitive damages permitted such awards on the basis of "reckless indifference to or disregard of the rights of others on the part of the wrongdoer." *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 442 (1980) (citations omitted). This standard did *not* require proof of "an intentional desire to injure, vex or annoy, or proof of malice, in order to sustain an award for punitive damages." *Id.* By contrast, Section 895.85 now provides that a plaintiff "may receive punitive damages if evidence is submitted showing that the defendant acted *maliciously* toward the plaintiff or in an *intentional disregard* of the rights of the plaintiff." Wis. Stat. § 895.85(3) (emphasis added). The intent of the legislature to heighten the standard for recovery of punitive damages could not be clearer. The change in the law was opposed by my colleague, Judge Lynn Adelman, when he served in the Wisconsin Senate. In a 1999 opinion, however, Judge Adelman acknowledged that the legislature's intent in passing the law had been "to make it more difficult for a plaintiff to recover punitive damages" by adopting a standard "more narrow than the case law standard which allowed punitive damages for conduct which showed a reckless indifference to or disregard of the rights of others on the part of the wrongdoer." *Unified Catholic Schools v. Universal Card Services Corp.*, 34 F.Supp.2d 714, 718 (E.D.Wis.1999). It is clear from the text of the statute that Section 895.85 marks a significant departure from the common law standard. The

12. See *infra*, Part IV–H.

defendants' extensive citations to the legislative history underscore this point.[13]

## B. Applying Section 895.85

In Wisconsin, the malicious or intentional conduct necessary to recover punitive damages must be proved by clear and convincing evidence. PUNITIVE DAMAGES at 327 (citing *Wangen, supra*). Wisconsin Jury Instruction 1707.1 provides some guidance concerning how to apply the stringent standard adopted in Section 895.85. The first part of the instruction re-states the statutory language. The second part provides:

> A person's acts are malicious when they are the result of hatred, ill will, a desire for revenge, or inflicted under circumstances where insult or injury is intended. A person acts in *intentional disregard* of the rights of the plaintiff if the person acts *with a purpose to disregard the plaintiff's rights,* or is *aware that his or her acts are practically certain to result in the plaintiff's rights being disregarded.*

Wis JI–Civil 1701.7.

The plaintiffs do not allege that either Star or Bennett acted maliciously or with a purpose to injure the decedents. Thus, if there is an argument to be made for punitive damages, it must be that the defendants acted with *intentional disregard* for the rights of the plaintiffs in the sense of being aware that their acts were practically certain to result in the plain-

tiffs' rights being disregarded. As the jury instruction makes clear, this state of mind has three characteristics that distinguish it from recklessness: (1) a subjective *awareness* on the part of the defendant (2) that his conduct is *practically certain* to result in (3) the *plaintiff's* rights being disregarded. A jury may not consider whether the defendant "ought to have been aware" of the potential for a certain outcome. Instead, the focus must be on his actual awareness. Secondly, for an outcome to be "practically certain," it must be more than "reasonably probable" or "likely," it must approach being inevitable. For example, it is "practically certain" that shouting "Fire!" in a crowded theater will cause panic. It is *not* practically certain (though it is very likely) that the New York Yankees will go to the World Series again this year. Lastly, the thing which must be practically certain is not harm in the abstract, or even harm to a certain class of people (*e.g.,* other drivers on the road), but harm *to the plaintiff. Hanaway v. Bach,* No. 98–CV–233 (Wal.Co.Cir.Ct.) Nov. 5, 1999, at 15–17.

The plaintiffs have failed to come forward with evidence—much less clear and convincing evidence—that Star and/or Bennett acted with intentional disregard for the rights of the Boomsmas and James Spencer. Even if the Court accepts as true the testimony of the plaintiffs' experts that Star was so profit-hungry that it permitted or encouraged Bennett to violate federal hours-of-service regulations and/or drive in a fatigued condition,[14] Star's "ac-

---

13. The Court does not agree with the plaintiffs that Star and Bennett have "misstate[d] the law regarding the quantum of evidence required to secure an instruction for punitive damages." If anything, the plaintiffs misstate the law when they imply that *Jones v. Secura Ins. Co.,* 249 Wis.2d 623, 638 N.W.2d 575 (2002) has liberalized the standard for recovery of punitive damages under Section 895.85. The decision in *Secura* contains a fleeting quotation of the pre–1995 common law standard. However, the new standard

under Section 895.85 was not directly at issue in *Secura* and indeed was not even quoted in that decision except in a footnote. Likewise, it is misleading for the plaintiffs to quote a portion of the *Unified Catholic Schools* decision out of context for the proposition that "all that is required to be shown [to recover punitive damages] is . . . 'bad intent deserving of punishment.'"

14. In light of the discussion, *supra,* concerning injury-causing conduct that allegedly occurred in Illinois, the Court has its doubts.

882

tive involve[ment] in creating and sustaining such illegality" would amount at most to reckless disregard for the safety of other drivers. Such conduct would support an award of punitive damages under the pre–1995 common law standard. *Wangen, supra.* It does not, however, constitute maliciousness or intentional disregard for the plaintiffs' rights. Accordingly, the defendants' motion in limine [260–1] is granted and the plaintiffs are barred from introducing evidence of the defendants' wealth or value. Likewise, in presenting their case for negligence, the plaintiffs must not argue, remark or suggest that the defendants' conduct was wilful, intentional, or malicious.

## IV. MOTIONS *IN LIMINE*

### A. Plaintiff's Motion *In Limine* #1 [251–1]

The plaintiffs' first motion in limine seeks to exclude evidence of Bennett's acquittal on criminal charges arising from the accident. The plaintiffs argue that such evidence is inadmissible hearsay, that it is irrelevant (because of the differing standards of proof in criminal and civil proceedings), and that its potential prejudice outweighs any probative value it may have. The third-party defendants join in the motion, relying upon *United States v. De La Rosa,* 171 F.3d 215 (5th Cir.1999); *United States v. Jones,* 808 F.2d 561 (7th Cir. 1986), *cert. denied,* 481 U.S. 1006, 107 S.Ct. 1630, 95 L.Ed.2d 203 (1987); and *United States v. Lahey,* 55 F.3d 1289 (7th Cir. 1995). Star and Bennett agree that evidence of the acquittal should be precluded. In addition, they argue that the Court's ruling, in limine, should extend "to preclude any party from making reference to the fact that Bennett was criminally prosecuted at all." The Court agrees that the broader order sought by the defendants is appropriate. To the extent it is necessary to introduce witnesses, exhibits, or trial transcripts from the criminal proceedings, the parties and their counsel must reference that evidence as being from "prior court proceedings." In the event that improper reference is made to the criminal prosecution, the Court will consider a defense motion to admit evidence of Bennett's acquittal or structure other appropriate relief.

### B. Plaintiff's Motion *In Limine* #2 [252–1]

Plaintiffs' second motion in limine seeks to preclude any reference to the fact that Charles Bennett's wife, Elizabeth Bennett, may have "lost a child to death." Such evidence, according to the plaintiffs, would be irrelevant and intended purely "to gain sympathy with the jury." The motion, being unopposed, is granted.

### C. Plaintiff's Motion *In Limine* #3 [253–1]

Plaintiffs' third motion in limine seeks to exclude from evidence "any and all evidence, argument, and/or reference to" a letter that Noreen Boomsma sent to the editor of the *Fond du Lac Reporter* concerning "the criminal trial and/or fog conditions." This motion, being unopposed, is granted.

### D. Plaintiff's Motion *In Limine* #4 [254–1]

Plaintiffs' fourth motion in limine seeks to exclude "any and all evidence, argument, and/or reference to" the fact that Frank Bartzen "had an opinion that James Spencer died prior to his arrival at the scene." The defendants and third-party defendants agree that Bartzen, a "first responder" at the scene of the accident, should be precluded from offering an opinion on this question (because he is not qualified to do so), but maintain that he should be allowed to testify concerning his

factual observations and his own actions at the scene. This proposed compromise is consistent with the Court's approach to the testimony of another non-expert who was on the scene shortly after the accident, Susan Casper. Accordingly, the motion is granted in part and denied in part. No opinion testimony may be elicited from Bartzen on the question of whether Spencer died prior to his arrival on the scene.

### E. Forrest Baker [256–1 and 258–1]

Before the Court are two separate defense motions aimed at the expert witness testimony of Baker. These motions are untimely under the briefing schedule established by Judge Reynolds. The defendants are, of course, free to cross-examine Baker vigorously concerning his opinions and whether or not they are "speculative" during the trial of this action. These in limine motions, however, are denied.

### F. "Non–Disclosed Experts" ( [255–1] and [259–1] )

The defendants seek to exclude the testimony of various "hybrid witnesses" whom the plaintiffs allegedly failed to disclose under Rule 26. The defendants earlier attempted to bar the testimony of Casper using the same rationale, but the Court determined that the version of Civ. L.R. 26.1 in effect during 1999–2000 did not require disclosure of hybrid witnesses. The same reasoning compels the Court to deny the defendants' motion[s] to bar non-disclosed experts.

### G. Star's Motion To Bar Presentation Of Evidence Concerning Whether Star/Bennett Have Insurance Coverage For Punitive Damages [261–1]

In light of the Court's decision not to admit any evidence or argument pertaining to punitive damages (see discussion *supra*), defendants' motion to bar evidence of insurance coverage for punitive damages is granted. The plaintiffs, in any event, concede that such evidence is inadmissible.

### H. Star/Bennett's Motion In Limine To Preclude Testimony From Decedents' Family Members Or Other Evidence Concerning "Loss Of Society & Companionship" Damages [262–1]

As noted above in connection with the likely length of the trial, the defendants have stipulated that the damages sustained by the plaintiffs who are legally entitled to recover damages for loss of society and companionship is the statutory maximum of $150,000. Accordingly, testimony or other evidence concerning such damages would serve no purpose other than to prejudice the defendants. The presentation of such evidence would also consume valuable time, which could be better devoted to issues that are actually in dispute. As the defendants correctly note, the stipulation means that "there is simply nothing for the jury to decide" with respect to this aspect of the case. In opposing this motion in limine, the plaintiffs reprise their arguments about the "unconscionable inequity" of applying Wisconsin law in this case. These arguments are in vain, however, because the Court has determined that Wisconsin law will apply. The motion is granted.

### I. Star/Bennett's Motion To Preclude Evidence Of Bennett's Criminal Records [264–1]

■ Fourteen years ago, Bennett was convicted of multiple counts of sexually assaulting a minor. He served prison time. The defendants are understandably eager to keep this information from the jury. The Court agrees that the convictions are completely irrelevant to the issues in this case and potentially extremely

prejudicial. The plaintiffs concede that the convictions are inadmissible under Rule 404 (character evidence), but argue that they may be admissible under Rule 609 for the purpose of impeaching Bennett's credibility should he testify. The Court will under Rule 609 exclude the prior felony evidence because fourteen years have passed since Bennett's conviction. Even if ten years have not passed since Bennett's release from the confinement imposed for the offense, the evidence is properly excluded under Rule 403.

### J. Star/Bennett's Motion To Bar Evidence of Chelsea's State Of Mind Prior To Death [263–1]

 The defendants, joined by the third-party defendants, ask the Court to "bar the plaintiffs from offering inferences or argument ... concerning Chelsea Boomsma's state of mind prior to her death for purposes of a claim for mental suffering or mental anguish." The defendants acknowledge that Chelsea may have experienced physical pain in the interval between the accident and her death several hours later. However, the defendants maintain there is no evidence that Chelsea experienced mental suffering caused either by an awareness of her own injuries or because she knew about the demise of her family members. Thus, according to the defendants, it would be speculative and prejudicial to allow "inferences or argument" concerning Chelsea's state of mind. The defendants' argument is belied by the deposition testimony of Randall Campshure, another "first responder" at the accident scene. Mr. Campshure unequivocally testified that he heard a girl's voice coming from the wreckage of the Boomsma vehicle, saying "Help us, help us; get us out of here." Deposition of Randall Campshure ("Campshure Dep."), p. 23. Because there appears to be a factual basis for the plaintiffs' intended "argument" and "inference"

concerning mental suffering endured by Chelsea, the defendants' motion is denied.

### K. Star/Bennett's Motion To Bar Evidence Relating To Post–Accident Log Modifications [257–1]

 The defendants seek to bar evidence that Star prompted Bennett to modify his driver's logs *subsequent to* the accident. The defendants argue that *post-accident* conduct lacks relevance and that, in any event, its probative value is outweighed by the danger of unfair prejudice to the defendants. According to the defendants, "[w]hat Bennett's *pre-accident* activities were and whether those activities are properly construed as 'on duty' or 'off duty' under Federal regulations can be placed before the jury without reference to the fact that Star met with Bennett *after* the accident and worked with him to amend the logs to comport with what Star felt was the appropriate interpretation of how to record that time." The plaintiffs argue that Star coerced Bennett into amending his logs and that such evidence is "highly probative of Star's business practices, and both defendants' proclivity for violating the law whenever they feel like it." Indeed, according to the plaintiffs, this evidence goes to the heart of their case, which is that "Star is a rogue firm that systematically violates federal laws enacted for safety simply to increase its revenues."

The Court disagrees with the defendants concerning the relevance of the disputed evidence. Although the parties' briefing fails to illuminate the point, it appears that the log modifications in question, though they were made (or discussed) after the accident, pertained to pre-accident entries. Evidence of the post-accident modifications could therefore be relevant if the modifications reflect a lack of care on the part of the defendants. *See* Fed.R.Evid.

401. As for prejudice, not every fact that is potentially embarrassing or difficult to explain should be excluded on prejudice grounds. The best way of dealing with this evidence is not to exclude it altogether but to allow the defendants to present the jury with their own explanation concerning the modifications. The motion is denied.

### L. Star/Bennett's Motion To Bar Accident Photos [265–1]

The defendants seek to bar the introduction of accident scene photos, especially any that "graphically depict[ ] the decedents within the wreckage following the accident." The defendants propose that the Court only allow photographs taken after the decedents' bodies were removed from the wreckage. The Court is inclined to agree that "bodily photos" would be unfairly prejudicial, especially since several of the decedents were children. On the other hand, plaintiffs and third-party defendants suggest (without much elaboration) that at least some of these photos may be relevant to issues of liability. Lacking the benefit of *in camera* inspection, the Court is unable to assess these arguments under Rule 403. Accordingly, unless the parties are able to reach agreement amongst themselves, the defendants shall submit to the Court, ten days before the trial of this action, all photographs they seek to exclude. The Court will issue a ruling prior to the start of trial. The motion is held in abeyance.

NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:

1. Plaintiffs' "Motion For Relief From Order" [276–1] is DENIED; and

2. Star and Bennett's "Motion In Limine On Punitive Damages Claims" [260–1] is GRANTED; and

3. Plaintiffs' motion in limine No. 1 seeking to bar evidence of Bennett's acquittal [251–1] is GRANTED; and

4. Plaintiff's motion in limine No. 2 seeking to bar evidence that Elizabeth Bennett "lost a child to death" [252–1] is GRANTED; and

5. Plaintiff's motion in limine—No. 3 [253–1] is GRANTED; and

6. Plaintiff's motion in limine—No. 4 [254–1] is GRANTED in part and DENIED in part; and

7. Defendants' motion to bar non-disclosed experts [255–1] is DENIED; and

8. Defendants' motion to bar non-disclosed expert opinions [259–1] is DENIED; and

9. Defendants' motion to bar the remarks of Forrest Baker that Star destroyed records [256–1] is DENIED; and

10. Defendants' motion to preclude evidence relating to post-accident log modifications [257–1] is DENIED; and

11. Defendants' motion to bar certain opinions of Forrest Baker [258–1] is DENIED; and

12. Defendants' motion to bar evidence of insurance coverage of punitive damages [261–1] is GRANTED; and

13. Defendants' motion to exclude evidence concerning loss of society and companionship [262–1] is GRANTED; and

14. Defendants' motion to bar evidence concerning Chelsea Boomsma's state of mind prior to death [263–1] is DENIED; and

15. Defendants' motion to preclude evidence of Bennett's criminal record [264–1] is GRANTED; and

16. Defendants' motion to exclude photographs of decedents' injuries [265–1] is held in abeyance; and

17. Defendants' motion to strike the affidavits of Mark Mitler and Forrest Baker [286–1] is GRANTED; and

18. The Court will conduct a conference call on May 24, 2002 at 10:00 AM (central time).

**SO ORDERED.**