Patricia WISCHER, individually, and as Special Administrator of the Estate of Jeffrey A. Wischer, deceased, Marjorie DeGrave, individually, and as Special Administrator of the Estate of William R. DeGrave, deceased, and Ramona Dulde-Starr, individually, and as Special Administrator of the Estate of Jerome W. Starr, deceased, Plaintiffs-Intervenors-Respondents,†

v.

MITSUBISHI HEAVY INDUSTRIES AMERICA, INC., Defendant-Appellant,

The TRAVELERS INDEMNITY COMPANY OF ILLINOIS, Defendant,

NEIL F. LAMPSON, INC., Defendant-Respondent,

LAMPSON INTERNATIONAL LTD., Federal Insurance Company, and The Tokio Marine & Fire Insurance Company, Defendants. [Case No. 01–0724.]

Patricia WISCHER, individually, and as Special Administrator of the Estate of Jeffrey A. Wischer, deceased, Marjorie DeGrave, individually, and as Special Administrator of the Estate of William R. DeGrave, deceased, and Ramona Dulde-Starr, individually, and as Special Administrator of the Estate of Jerome W. Starr, deceased, Plaintiffs-Respondents-Cross-Respondents,†

† Petition to review granted 12-23-03.

v.

MITSUBISHI HEAVY INDUSTRIES AMERICA, INC.,
Defendant-Respondent-Cross-Appellant,

The TRAVELERS INDEMNITY COMPANY OF ILLINOIS,
Defendant-Appellant-Petitioner,

NEIL F. LAMPSON, INC. and Lampson International
Ltd., Defendants,

FEDERAL INSURANCE COMPANY, Defendant-Co-
Appellant,

The TOKIO MARINE & FIRE INSURANCE COMPANY,
Defendant. [Case No. 01–1031.]

Patricia WISCHER, individually, and as Special Ad-
ministrator of the Estate of Jeffrey A. Wischer,
deceased, Marjorie DeGrave, individually, and as
Special Administrator of the Estate of William R.
DeGrave, deceased, and Ramona Dulde-Starr, in-
dividually, and as Special Administrator of the
Estate of Jerome W. Starr, deceased, Plaintiffs-
Respondents-Cross-Respondents,†

v.

MITSUBISHI HEAVY INDUSTRIES AMERICA, INC.,
Defendant-Respondent-Cross-Appellant,

The TRAVELERS INDEMNITY COMPANY OF ILLINOIS,
Defendant-Appellant-Cross-Respondent,

NEIL F. LAMPSON, INC. and Lampson International
Ltd., Defendants,

FEDERAL INSURANCE COMPANY and The Tokio Marine & Fire Insurance Company, Defendants-Respondents-Cross-Appellants.
[Case No. 01–2486.]

Court of Appeals

*Nos. 01–0724, 01–1031 and 01–2486.*
*Oral argument July 1, 2003.—Decided September 30, 2003.*

2003 WI App 202

(Also reported in 673 N.W.2d 303.)

On behalf of the defendant-appellant and defendant-respondent-cross-appellant Mitsubishi Heavy Industries America, Inc., the cause was submitted on the briefs of *Ralph A. Weber, Amelia L. McCarthy* and *David E. Osswald* of *Reinhart Boerner Van Deuren S.C.*, Milwaukee, *Colleen D. Ball* of *Appellate Counsel*

*S.C.*, Wauwatosa and *John W. Bell* and *Kevin G. Owens* of *Johnson & Bell, Ltd.*, Chicago, Illinois. There was oral argument by *Ralph A. Weber*.

On behalf of the defendant-respondent-cross-appellant Mitsubishi Heavy Industries America, Inc., the cause was submitted on the brief of *Dean P. Laing* and *William A. Wiseman* of *O'Neil, Cannon & Hollman, S.C.*, Milwaukee. There was oral argument by *Dean P. Laing*.

On behalf of the defendant-respondent Neil F. Lampson, Inc., the cause was submitted on the brief of *Donald H. Carlson, Jeffrey T. Nichols* and *Ryan G. Braithwaite* of *Crivello, Carlson & Mentkowski, S.C.*, Milwaukee. There was oral argument by *Donald H. Carlson*.

On behalf of the plaintiffs-intervenors-respondents and plaintiffs-respondents-cross-respondents, the cause was submitted on the briefs of *Robert L. Habush, Daniel A. Rottier, Mark S. Young* and *Virginia M. Antoine*, of *Habush Habush & Rottier, S.C.*, Milwaukee and *David P. Lowe* of *Jacquart & Lowe, S.C.*, Milwaukee. There was oral argument by *Robert L. Habush*.

On behalf of the defendant-appellant-petitioner and defendant-appellant-cross-respondent The Travelers Indemnity Company of Illinois, the cause was submitted on the briefs of *Brady C. Williamson, James A. Friedman* and *Katherine Stadler*, of *La Follette Godfrey & Kahn*, Madison. There was oral argument by *Brady C. Williamson*.

On behalf of the defendant, defendant-co-appellant and defendant-respondent-cross-appellant Federal Insurance Company, the cause was submitted on the briefs of *John A. Busch* and *Christopher C. Mohrman* of *Michael Best & Friedrich LLP*, Milwaukee and *Edward B. Ruff III, Michael Clarke, pro hac vice* and *Benjamin*

A. Crane, *pro hoc vice* of *Pretzel & Stouffer, Chartered*, Chicago, Illinois. There was oral argument by *John A. Busch*.

On behalf of the defendant, defendant-respondent-cross appellant The Tokio Marine & Fire Insurance Company, the cause was submitted on the briefs of *Jeffrey S. Fertl* of *Hinshaw & Culbertson*, Milwaukee. There was oral argument by *Jeffrey S. Fertl*.

A nonparty brief was filed by *Eric Englund*, Madison, for Wisconsin Insurance Alliance.

An amicus curiae brief was filed by *William C. Gleisner, III* of *Law Offices of William C. Gleisner, III*, Milwaukee for the Wisconsin Academy of Trial Lawyers.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. WEDEMEYER, P.J. This case involves three consolidated cases in the so-called "Miller Park" appeals.[1] Although the cases underlying this consolidated appeal present many issues of varying complexity, there is one dispositive issue: whether, based on the facts as conceded by the plaintiffs, the $94,000,000 punitive-damage award is contrary to the calls of WIS. STAT. § 895.85(3) (1999–2000).[2] We hold that it is. Accordingly, we reverse the punitive-damage award, and consequently do not address the other issues. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only

---

[1] On February 21, 2002, this court ordered case numbers 01–1031 and 01–2486 consolidated for the purposes of briefing and disposition. On this court's own motion, we now order that case number 01–0724 be consolidated with the aforereferenced appeals for dispositional purposes.

[2] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

dispositive issues need be addressed). The judgment relative to the compensatory damage award is affirmed.

## I. PROCEDURAL BACKGROUND

¶ 2. In appeal number 01–0724, Mitsubishi Heavy Industries America, Inc., appeals from a judgment dismissing Neil F. Lampson, Inc. (the designer and manufacturer of the crane involved), following the trial court's decision directing a verdict in Neil F.'s favor. Patricia Wischer, Marjorie DeGrave and Ramona Dulde-Starr (the plaintiffs) filed a motion to intervene in this appeal, which was granted.[3]

¶ 3. In the other consolidated cases, The Travelers Indemnity Company of Illinois and Federal Insurance Company appeal from judgments entered against them and in favor of the plaintiffs and in favor of Mitsubishi, their insured. Mitsubishi filed a cross-appeal challenging the judgment rendered in favor of the plaintiffs following a seven-week jury trial. In addition, Travelers appeals from the trial court's judgment ordering it to pay the entire jury verdict as a consequence of its failure to plead and prove its policy limits during the trial. Federal and The Tokio Marine & Fire Insurance Company cross-appeal from the judgments rendered against them and in favor of the plaintiffs and Travelers, ordering the insurers to pay their policy limits of $50,000,000 and $2,000,000, re-

---

[3] Mitsubishi claims the trial court erred when it: (1) directed a verdict in favor of defendant Neil F.; (2) erroneously precluded expert testimony from Mitsubishi's expert, which would have bolstered Mitsubishi's negligence case against Neil F.; and (3) declared that Neil F.'s potential liability was moot.

spectively. In this case, Mitsubishi also maintains a cross-appeal against the plaintiffs.[4]

¶ 4. The dispositive issue in this appeal is governed by WIS. STAT. § 895.85(3), enacted by our legislature in 1995, which provides: "The plaintiff may receive punitive damages if evidence is submitted

---

[4] Travelers presents seven claims: (1) the $94,000,000 punitive damage award is unconstitutional; (2) the trial court's post-verdict decision on punitive damages deprived the defendants of statutory due process; (3) WIS. STAT. § 895.85(3) was erroneously interpreted by the trial court, leading to erroneous instructions to the jury, and an improper award of punitive damages; (4) the trial court erred in ruling that Travelers is responsible for the entire amount of the verdict despite its $25,000,000 policy limit; (5) exclusions in the policy preclude coverage for the judgment against Mitsubishi; (6) the trial court erroneously ignored the Department of Workforce Development's preliminary determination that the three decedents involved were loaned employees to Mitsubishi; and (7) the mid-trial settlement agreement limits the recovery amount.

Federal and Tokio Marine claim: (1) Wisconsin's direct action statutes do not permit a claim solely based on punitive damages; (2) the insurance policies do not provide coverage for the damages; (3) the judgment directly against the insurers here is unconstitutional and violates public policy; (4) the settlement agreement caps liability and therefore no post-judgment interest may be awarded; and (5) the trial court erred in ruling that Travelers has a valid claim to equitable subrogation against Federal and Tokio Marine.

Mitsubishi makes four arguments in support of its claim that the trial court erred: (1) the trial court erroneously refused to include the decedents' employer on the verdict; (2) the trial court misinterpreted the new punitive damage statute, which led to an improper punitive damage award; (3) the trial court erroneously excluded evidence of Mitsubishi's wealth; and (4) the punitive damage award is excessive.

showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff."

█

¶ 5. Based upon our analysis of the statute, we hold that the phrase "intentional disregard of the rights of the plaintiff" in WIS. STAT. § 895.85(3) can only be reasonably interpreted to require either an intent by a defendant to cause injury to the plaintiffs or knowledge that the defendant's conduct was practically certain to cause the accident or injury to the plaintiffs. Based on this conclusion, together with the concession by both the plaintiffs and the trial court that there is no evidence demonstrating that Mitsubishi intended to cause injury or knew that its conduct was practically certain to cause injury, we reverse the award of punitive damages.[5]

¶ 6. Because we have reached this conclusion, it is not necessary for us to address any of the other issues raised in this appeal. All of the remaining issues are moot.

## II. FACTUAL BACKGROUND

¶ 7. July 14, 1999, was to be an exciting day in the construction of Miller Park stadium, the home of the Milwaukee Brewers major league professional baseball team. On that day, a crane known as "Big Blue" was to lift a large piece of the retractable roof of the stadium so workers could bolt it into place. Unfortunately, the lift did not go as planned. Big Blue broke and its boom

---

[5] The court acknowledges, with gratitude, the amicus curiae briefs filed by the Wisconsin Academy of Trial Lawyers, the Wisconsin Insurance Alliance and the Wisconsin Manufacturers and Commerce.

struck the crane holding three ironworkers who were to secure the roof. All three workers fell to their instant death.

¶ 8. In order to understand the events of July 14, 1999, it is important to know who the relevant parties and non-parties are and how they came to work together that fateful day.

The Parties

¶ 9. The construction of Miller Park stadium was a joint effort involving many individuals and business organizations. The general contractor for the construction project was a joint venture of three companies: Hunzinger Construction Company, Clark Construction Builders, Inc., and Huber, Hunt & Nichols, Inc. ("general-contractor joint venture"). The general-contractor joint venture hired eighty contractors and those contractors hired approximately two hundred subcontractors.

¶ 10. One of the contractors hired by the general-contractor joint venture was Mitsubishi Heavy Industries America, Inc. Mitsubishi was hired to build the stadium roof according to an architectural design, to erect the roof, and to design, build, and install the drive system that moved the roof panels. Victor Grotlisch was Mitsubishi's site manager, and Wayne Noel was Mitsubishi's safety superintendent.

¶ 11. Mitsubishi hired Lampson International Ltd., an industry leader in performing heavy lifts, to help install the roof of the stadium. Lampson International leased a crane known as "Big Blue" to Mitsubishi. On April 22, 1998, Mitsubishi and Lampson International entered into an agreement for the lease of a crane to assist in the lift of the Miller Park roof. The lease agreement stated that Lampson International would

provide a TransiLift 1200 Series IIA crane; however, Lampson International actually provided a TransiLift 1500 Series IIIA crane.

¶ 12. A transi-lift crane is a crane that is not stationary; it can pick up and transport extremely heavy loads. Big Blue is a TransiLift crane that stands forty-five stories high and rests on a base only ten yards wide. The crane sits on two crawlers, the means by which it moves. A car body sits on each crawler, and on each body are a table and a plastic bearing. The boom is the long lattice arm extending from the plastic bearing. At the end of the boom is a joint, and extending beyond the joint is a shorter lattice called the jib. Any load carried by the crane hangs from the jib.

¶ 13. Lampson International also supplied a crew to assemble Big Blue on site, and provided a crew to operate the crane. Fred Flowers was the crane operator; Alan Watts was the flagger and supervisor for the Lampson crew.

¶ 14. Neil F. Lampson was the principal designer and manufacturer of the TransiLift crane known as Big Blue. As designer, Neil F. made changes to the design of Big Blue and a last minute addition to the assembly of the crane. Both changes and the possibility of a negligent design of the crane were raised as issues in this case.

¶ 15. Danny's Construction Company, Inc. (DCCI) was hired to bolt the stadium roof into place. The deceased ironworkers employed by DCCI included Jeffrey Wischer, William DeGrave and Jerome Starr. Red Lewis was DCCI's superintendent and Joe Edwards was the operator of the crane that lifted the ironworkers.

### Insurance

¶ 16. The stadium's owner, Southeast Wisconsin Professional Baseball Park District, purchased an Owners Controlled Insurance Program (OCIP) to provide commercial general liability insurance coverage for the Miller Park construction project. The coverage was "layered" in that each insurer's coverage attached when the underlying policy was exhausted. Thus, one insurer provided coverage up to a certain amount and, when that amount was exhausted, another insurer provided coverage up to a certain amount, and so on. The priority for coverage under the OCIP was as follows:

| | |
|---|---|
| The Travelers Indemnity Company of Illinois | $2,000,000 |
| Royal Insurance Company of America | $5,000,000 |
| Indemnity Insurance Company of North America | $20,000,000 |
| Federal Insurance Company | $50,000,000 |
| The Travelers Indemnity Company of Illinois | $25,000,000 |
| The Tokio Marine & Fire Insurance Company | $2,000,000 in separate coverage for MHIA, attaches at $75,000,000. |

¶ 17. The parties entered into three settlement agreements. The first two were entered into before trial and involved the payment of $2,000,000 (Travelers) and $5,000,000 (Royal) to the plaintiffs. The third settlement is known as the IINA agreement, which was entered into during trial on November 7, 2000. Under the IINA settlement, the plaintiffs entered into an agreement with Mitsubishi, its parent company, Mitsubishi Heavy Industries LTD, and Indemnity Insurance Company of North America (IINA). The agreement provided for an immediate payment of $12,375,000, which would be credited against any compensatory damages awarded by the jury. The IINA

agreement then capped punitive damages at $84,626,000 if it was later determined that Mitsubishi had insurance coverage, and $10,000,000 if Mitsubishi did not have insurance coverage.

¶ 18. The IINA agreement was not disclosed to the trial court or any other party until one month after the jury reached its verdict. The jury returned a compensatory damage verdict of $5,250,000 and a punitive damage award of $94,000,000 against Mitsubishi.

### The Day of the Lift

¶ 19. At 7:30 a.m. on July 14, 1999, several people participated in a pre-lift meeting at Miller Park. At that meeting, Victor Grotlisch, Mitsubishi's site manager, discussed the weather report, Allen Watts, the Lampson supervisor, discussed how the lift would occur, and Wayne Noel, Mitsubishi's safety supervisor, discussed safety issues involved in the lift, including rescue, radio communication, and responsibilities. At this meeting, Noel told the workers that anyone could stop the lift for any reason at any time if it was unsafe to continue.

¶ 20. While Mitsubishi stresses the importance of this statement because the lift requires people at different locations watching the lift from different angles, the plaintiffs claim that the workers are in no position to tell supervisors to stop a lift because the workers, having families to support, do not want to risk their jobs.

¶ 21. At about 10 a.m., Big Blue picked the roof piece off of the ground and crews checked the load stabilization and center of gravity. By 11:00 or 11:30 a.m., Grotlisch, Watts, and a DCCI representative agreed that the lift could proceed. Watts, Lampson's supervisor, was then in charge of the lift.

¶ 22. Later in the afternoon, Grotlisch checked the wind speeds and was informed by Watts that the lift was going fine. Wischer, DeGrave and Starr entered the man basket and were lifted so that they could bolt the roof into place. As the roof was being lifted, there was a squeal of brakes and a loud snap. Big Blue toppled and struck the boom of the crane holding the ironworkers. Wischer, DeGrave and Starr fell to an instant death.[6]

Procedural History

¶ 23. On August 12, 1999, plaintiffs, the wives of the decedents, filed a lawsuit charging the general-contractor joint venture, Mitsubishi, Lampson International, and Neil F. Lampson with negligence, seeking compensatory and punitive damages. On September 15, 2000, based on a settlement, the court dismissed the general-contractor joint venture from the lawsuit. On

---

[6] The parties disagree in many respects as to the cause of the crane collapse. The plaintiffs claim that the crane collapsed because it was misused by Mitsubishi in excessive winds, that Mitsubishi never performed wind load calculations, and that the wind conditions that day far exceeded the load chart limitations. Mitsubishi, however, claims that Lampson International never told Mitsubishi that wind sail calculations had to be done or that Lampson International did not do the calculations.

The parties also contest wind speeds that day. Mitsubishi site manager Victor Grotlisch claims he checked the weather forecast and that winds were between 15–17 mph. Because the load chart limited Big Blue to winds less than 20 mph, Grotlisch and Noel claim they continued with the lift within appropriate wind speeds. Lampson International claims that the wind speeds that day were between 20–25 mph, with gusts between 25 and 35 mph. Plaintiffs agree with those figures, adding that at 5:00 p.m., just minutes before the collapse, the wind speeds at Mitchell Field were 21 mph, with gusts of 26 mph. Mitchell Field is 9.6 miles from Miller Park.

652

October 16, 2000, the case went to trial. During trial, the parties disagreed on the interpretation of Wisconsin's punitive damages statute, Wis. Stat. § 895.85(3). As noted, the statute states:

> The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.

Wis. Stat. § 895.85(3).

¶ 24. During the trial, the court directed a verdict in favor of Neil F., leaving Mitsubishi and Lampson as the only defendants in the lawsuit. On November 7, 2000, the IINA agreement was executed, limiting Mitsubishi's liability, and on December 1, 2000, the jury returned a verdict attributing 97% liability to Mitsubishi and 3% liability to Lampson International. As noted, the jury awarded $5,250,000 million in compensatory damages and $94,000,000 in punitive damages against Mitsubishi. Mitsubishi filed several post-verdict motions, all of which were denied by the trial court.

¶ 25. After the jury verdict was returned, the plaintiffs amended their complaint to seek recovery of punitive damages from Federal Insurance Company, claiming that Federal was liable to the plaintiffs for the damages. The plaintiffs also amended the complaint to seek recovery of punitive damages from Tokio Marine, seeking a declaratory judgment that its policy provided coverage for punitive damages. After motions and hearings, the trial court entered summary judgment against Federal and Tokio Marine in their direct actions.

¶ 26. Separate from Federal and Tokio Marine's liability to the plaintiffs is their liability to Travelers. The trial court entered judgment against Travelers Insurance Company for $84,625,000 for Travelers's

failure to plead and prove its policy limits as part of the OCIP. As a result, Travelers filed cross-claims against Federal and Tokio Marine for equitable subrogation, equitable contribution, and unjust enrichment. The trial court concluded that Travelers was entitled to judgment against Federal and Tokio Marine on a theory of equitable subrogation. The trial court concluded that the $77,000,000 judgment against Mitsubishi was payable as follows:

> With respect to the plaintiffs' judgment against [Mitsubishi], the remaining amount of which is $77 million plus taxable costs and interest, the first $50 million plus corresponding taxable costs and interest is insured by Federal . . . the next $25 million plus corresponding taxable costs and interest is insured by Travelers . . . and the last $2 million plus corresponding taxable costs and interest is insured by Tokio Marine . . . . For the benefit of [Mitsubishi] only, the entire $77 million plus corresponding taxable costs and interest, as previously adjudged, is insured by Travelers . . . .

¶ 27. Based on the above judgments, Mitsubishi appeals the punitive damage award as excessive and not warranted by the evidence contending that there is no evidence of either intent to injure the decedents or knowledge that such injury was practically certain to occur. Mitsubishi also appeals the trial court order dismissing Neil F. from the action, the trial court's refusal to include DCCI on the verdict, and the trial court's refusal to admit evidence of Mitsubishi's wealth. The plaintiffs intervened in this appeal because they believed resolution of this matter might affect the punitive damage judgment.

¶ 28. Travelers Insurance appeals the $77,000,000 judgment against it for failing to plead and prove its policy limits in the trial court. Travelers

argues that its policy limit was $25,000,000, and its policy attaches at the $77,000,000 mark; therefore, it should not be liable for $77,000,000 because Travelers cannot be liable for more than its policy limits. Travelers also argues that if the judgment against it is affirmed, the cross-claims against Federal and Tokio Marine should also be affirmed because the judgments do "no more than enforce those two insurance contracts, preventing both an injustice to Travelers and an outrageous windfall for Federal and Tokio."

¶ 29. Federal Insurance appeals the direct action judgment against it in favor of the plaintiffs and the judgment against it in favor of Travelers on the cross-claim. Federal claims that the Wisconsin direct action statute does not provide the plaintiffs with a cause of action against it and, even if the statute does, the insurance policy does not cover punitive damages because such an award is against public policy and in excess of Mitsubishi's liability under the IINA agreement.

¶ 30. Tokio Marine appeals the direct action judgment against it in favor of the plaintiffs and the portion of the judgment against it in favor of Travelers on its cross-claim. Tokio Marine claims that Travelers must be liable for the amount of damages because it failed to prove its policy limits. In addition, Tokio Marine claims that its policy does not cover punitive damages because such an award is in excess of Mitsubishi's liability under the IINA agreement.

## III. DISCUSSION

¶ 31. Indeed, there is no dispute that this case involved a horrible tragedy. The three men who died gave their lives in the process of erecting a state-of-the-

art structure. The wives and families of the decedents suffered an immeasurable loss. In compensation for the loss, the three plaintiffs have received a total of $27,000,000. Regardless of our decision on this appeal, that compensation stands.[7]

¶ 32. The dispositive issue in this case involves the interpretation of a statute. Accordingly, our review is independent from that of the trial court. *Stephenson v. Universal Metrics, Inc.*, 2002 WI 30, ¶ 26, 251 Wis. 2d 171, 641 N.W.2d 158. As a part of our interpretation, we strive to ascertain and enforce the intent of the legislature; our first consideration is the plain language of the statute. *Id.*, ¶ 27. The language of the statute provides: "The plaintiff may receive punitive damage if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." WIS. STAT. § 895.85(3). We conclude that the statute is not ambiguous. *See State v. Peters*, 2003 WI 88, ¶ 14, 263 Wis. 2d 475, 665 N.W.2d 171. When the language of a statute is clear, we need only apply the statutory text to determine the statutes meaning. *Id.* (citation omitted). If the language of the statute unambiguously expresses the intent of the legislature, we apply that meaning without resorting to extrinsic sources of legislative intent. *Id.* (citation omitted). Statutory language is given its common, ordinary and accepted meaning. *Id.* (citation omitted). Rules of statutory construction are inapplicable if the language of the statute has a plain and

---

[7] Before trial, Travelers paid $2,000,000 and Royal paid $5,000,000. Pursuant to the mid-trial settlement, IINA paid $12,375,000 and, after the verdict, IINA paid $7,625,000. It is undisputed that this appeal will not in any way affect the $27,000,000 already paid to the plaintiffs.

reasonable meaning on its face. *Id.* (citation omitted). Moreover, "[w]hether there is sufficient evidence to submit the question of punitive damages to the jury is a question of law which this court independently reviews." *Loveridge v. Chartier*, 161 Wis. 2d 150, 187–88, 468 N.W.2d 146 (1991).

¶ 33. Here, the plain language of the statute sets forth two standards under which punitive damages may be appropriate. The first category indicates punitive damages may be appropriate if the conduct is *malicious*. The second category allows a punitive damage award when there is *an intentional disregard of the rights of the plaintiff.*

¶ 34. All parties concede that the record here is devoid of malicious conduct. Plaintiffs' lead counsel, Robert L. Habush, stated:

> We concede that there was no malicious act here, we concede it is not necessary for them to intend to have harmed these people . . . . [T]he hazard, the wind, and doing a lift in the face of this wind without any engineering calculations whatsoever, once that's known, they affirmatively decided to go ahead with this lift, and that is the intentional disregard.

The dispute then specifically entails the interpretation of the phrase "intentional disregard of the rights of the plaintiff." The plaintiffs argue that this standard simply requires evidence demonstrating that Mitsubishi acted volitionally to do something that resulted in the rights of the decedents to a safe work environment being disregarded, and that this part of the statute does not require that any of Mitsubishi's employees either intended that harm result or have either subjective or objective knowledge that such harm was practically certain to occur. They contend that Grotlisch's decision

to proceed with the lift on such a windy day under hazardous conditions demonstrated his disregard for the rights of the plaintiffs, thus satisfying the statutory standard and justifying the jury's punitive damage award.[8] The plaintiffs thus argue that punitive damages are appropriate when the defendant intentionally disregards the injured party's right to safety, but that intent to injure is not required. In his closing argument, plaintiffs' counsel stated:

> I believe the evidence has shown to you that there was intentional disregard of the rights of the three deceased ironworkers. The intentional part is easy. They intended to do the lift. They made the decision to do the lift. It was an intentional decision. They didn't stumble into it. It was an intentional decision in the face of hazards and obvious wind conditions, and in doing so, they ignored, they disregarded the rights of those three men.

> And what were those rights? The right to a safe workplace. The right to life. And in so doing, they intentionally disregarded those rights of the three deceased ironworkers.

> We don't have to prove that Victor Grotlisch intended to kill these guys. This is not a criminal case. We don't have to prove that they knew for sure that crane was going to go down.

> Let me give you an example. A person decides to run the stop sign, I'm going to run that stop sign, and in running that stop sign crashes into a crossing vehicle,

---

[8] Specifically, the plaintiffs claimed that no one did the necessary wind calculations for the roof piece involved, that Grotlisch knew it was unsafe to proceed with the lift without the calculations, and that Grotlisch knew the crane's performance could be impeded if exposed to winds in excess of 20 m.p.h.

killing the occupants. Would we hear that driver be able to say, I didn't intend to kill those occupants, I didn't know Sally, I didn't know Bill, I didn't intend to kill them?

But that person intended to run that stop sign and, in so doing, must bear the consequences of an intentional disregard of the rights of any other vehicle or pedestrian that might have come into harm's way by that intentional act.

. . . .

There can't be any question, members of the jury, that this was an intentional decision on the part of Grotlisch, concurred in by Noel, that the hazards were obvious and ignored, that the rights of these three men, the right to life, the right to limb, the right to a safe workplace, were ignored and disregarded, as the law calls.

¶ 35. On the other hand, the defendants argue that punitive damages would be appropriate only if Mitsubishi either: (1) intended to cause the accident or injury; or (2) was aware that its conduct was practically certain to cause the accident or injury. Based on this standard, Mitsubishi claims that this case is not appropriate for a punitive damages award because, as the plaintiffs concede, Mitsubishi did not intend to cause injury or believe with substantial certainty that injury would occur. In their brief in opposition to Federal's summary judgment motion, the plaintiffs concede the following:

The fact that Grotlisch was in the zone of danger indicates that he could not have believed that there was a substantial certainty that injury would occur.

. . . .

[T]here is no evidence to permit a reasonable jury to conclude that the [Mitsubishi] employees intended to cause bodily injury to the decedents or that they knew or should have known that bodily injury was substantially certain to follow from their acts.

Mitsubishi argues that because the defendants did not act with malice, and because the plaintiffs concede that the defendants did not intend to injure the plaintiffs, there was no punitive damages issue for the jury.[9]

¶ 36. Mitsubishi contends that its interpretation of the new statutory standard is supported by the legislature's intent to narrow the types of cases in which a punitive damage award would be appropriate. Mitsubishi points to the guidance offered by the jury instruction committee in interpreting the new statute and suggests that the proper interpretation of the statutory standard requires either intent to cause the accident or injury *or* knowledge that its conduct was practically certain to cause the accident or injury.

---

[9] The conflict in interpretation of the statute was clear even before the trial began. The plaintiffs stated:

> If the legislature had intended to wipe out punitive damages, they [sic] could have. If the legislature had intended to limit the malicious acts, they [sic] could have. All they changed was the word reckless disregard into intentional disregard. And concede, Your Honor, that that did make it tougher, and that with respect to some other cases, acts of omission would not meet that burden, 'cause that would be reckless, it's a negligence connotation, but when they intended to go forward in the face of known hazards, that intentional disregard, and that's all the law requires us to meet.

Defendants responded:

> [W]e have an entirely different view of the law. We think [plaintiffs' counsel is] using old recklessness standard, but we'll deal with that at the time of the trial.

¶ 37. When faced with this disputed issue during the trial, the trial court agreed with the statutory interpretation proffered by the plaintiffs. Adopting the plaintiffs' interpretation, the trial court determined that there was sufficient evidence to submit the issue of punitive damages to the jury. The court ruled:

> There is absolutely no evidence in this record to show that it was the intent of anyone, let alone Mitsubishi, there was never any evidence to indicate that Mitsubishi or anyone intended to cause an injury. There was a finding by the jury on the punitive damage questions that there was an intentional disregard of the rights of the plaintiffs and others.
>
> . . . .
>
> People may do things in a negligent way, they may intend to do a certain act without intending to actually injure or hurt someone, and that's the standard of negligence, care without intending to do harm, does something or fails to do something that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property.
>
> That is the negligence the jury found in this case, and the jury also found that there was just an intentional disregard with regard to the rights of the plaintiff and others to have a safe environment to work in. It's just that simple.

¶ 38. We conclude that the trial court's interpretation of the statute was erroneous. We reach the opposite conclusion based on the reasoning that follows. Before the enactment of WIS. STAT. § 895.85(3), punitive damages were governed by the common law. There was a variety of terms used to describe circumstances under which punitive damages were appropriate: acting ma-

liciously or in wanton, willful, or reckless disregard of the plaintiff's rights. *See* Wis JI—Civil 1707; *Wangen v. Ford Motor Co.,* 97 Wis. 2d 260, 267, 294 N.W.2d 437 (1980) (Punitive damages may be awarded if the party seeking those damages demonstrates by the middle burden of proof that there was "a reckless indifference to or disregard of the rights of others and conscious action in deliberate disregard of them."). The legislature, intending to limit circumstances where juries could award punitive damages, enacted § 895.85(3) which, as we have seen, now requires that there be an intentional disregard of the rights of the plaintiff, not merely "reckless indifference" to those rights.

¶ 39. Clearly, by using the word *intentional,* the legislature intended to heighten the standard for the recovery of punitive damages. Although the legislature did not supply a definition of the new phrase "intentional disregard of the rights of the plaintiff," Note 2 accompanying Wis JI—Civil 1707.1, offers some guidance:

> The [second] basis for punitive damages is if the "defendant acted . . . in an intentional disregard of the rights of the plaintiff." This part of the standard was clearly intended to be more narrow than the case law standard which allowed punitive damages for conduct which "shows a reckless indifference to or disregard of the rights of others on the part of the wrongdoer." . . . The legislative history reveals only that "intentional disregard" was ultimately favored over earlier drafts and bills which provided recovery for "wilful disregard" of the rights of the plaintiff. See LRB-1744 drafted 12/3/94, 1993 S.B. 152, 1991 S.B. 138, 1989 S.B. 153 (which provided "wilful or conscious" disregard).

> There is, of course, no case law which defines "intentional disregard of the plaintiff's rights." The Committee finds the statutory formulation of <u>criminal</u>

intent in WIS. STAT. § 939.23, to be helpful. " 'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified, or is aware that his or her conduct is practically certain to cause that result." The Committee's reference to the Criminal Code's formulation of the definition of "intentionally" is well supported by the court of appeals decision in *Shepard v. Outagamie County*, 189 Wis. 2d 279, 286–87, 525 N.W.2d 764 (1994). In *Shepard*, the court of appeals found that: "The legal definition of 'intentional' is essentially the same, whether found in tort law or criminal law, and we see no reason to use a separate definition when interpreting the same word . . . ." *Id.* . . . Accordingly, the Committee largely adapted the definition of "intentionally" as set forth in section 939.23.

WISCONSIN STAT. § 939.23(3) defines intent under criminal law: " 'Intentionally' means that the actor either has a purpose to do the thing or cause the result specified, *or* is aware that his or her conduct is practically certain to cause that result." (Emphasis supplied.) This conclusion is further supported by WIS JI—CIVIL 2001, which provides a definition of "intent":

> Intent requires both an intent to do an act *and* an intent to cause injury by that act. An intent to cause injury exists where the actor actually means to cause injury by his or her conduct or where injury is almost certain to occur from the actor's conduct.
>
> . . . .
>
> If . . . the conduct of (defendant) merely created a risk of some harm to someone, which may or may not have resulted, then (defendant)'s conduct was negligent as opposed to intentional.

¶ 40. Based on this analysis offered by the jury instruction and the Jury Instruction Committee, which our supreme court acknowledges can offer "insightful and persuasive" assistance in interpreting legislative enactments, *see Nommensen v. American Cont'l Ins. Co.*, 2001 WI 112, ¶ 47, 246 Wis. 2d 132, 629 N.W.2d 301, we are convinced that there is only one reasonable interpretation of WIS. STAT. § 895.85(3). The more demanding statute requires both a general intent to perform an act *and a specific intent to cause injury by that act or knowledge that the act is practically certain to result in injury,* and not, as the plaintiffs would have it, a volitional act that results in unintended and unforeseen injuries.

¶ 41. To conclude otherwise would lead to unreasonable results and *expand,* rather than narrow, the scope of cases where punitive damages may be awarded. To affirm the trial court's interpretation of the statute would permit the request for punitive damages in almost any negligence case, contrary to the intent of the legislative enactment. For example, in a vehicle collision caused because the tortfeasor was talking on a cellular telephone, punitive damages could be sought and awarded. Under the trial court's standard, the victim could argue that the tortfeasor intentionally disregarded his or her rights by deliberately choosing to talk on the phone while driving. We hold that the intent of the legislature with respect to the new punitive damages statute was to "make it more difficult for a plaintiff to recover punitive damages." *See Unified Catholic Sch. v. Universal Credit Card Servs. Corp.*, 34 F. Supp. 2d 714, 718 (E.D. Wis. 1999); *see also Boomsma v. Star Transp., Inc.*, 202 F. Supp. 2d 869, 880 (E.D. Wis.

2002). As aptly observed by Marc Galanter in his treatise on punitive damages:

> [T]he heartland of punitive damages awards is in *intentional* torts and in cases involving financial rather than physical harm. Such cases produce punitive damages awards in larger numbers and at a higher rate than do cases involving other types of harm. In particular, the rates in personal injury cases are far lower . . . .

Marc Galanter, *Shadow Play: The Fabled Menace of Punitive Damages,* 1998 Wis. L. Rev. 1, 2 (1998) (emphasis added). In recent years, punitive damage awards have become commonplace in unintentional tort cases; however, with the passage of Wis. Stat. § 895.85(3), our legislature, as a matter of public policy, has decided to return punitive awards to its place of origin.[10]

¶ 42. During oral argument in this case, plaintiffs' counsel admitted that his interpretation of the statute would expand rather than narrow the number of cases under which punitive damages could be awarded. A member of our panel asked plaintiffs' counsel what he saw as the result under his interpretation of Wis. Stat. § 895.85(3) and *Loveridge,* 161 Wis. 2d 150, 468 N.W.2d 146 (1991), where the supreme court overturned an award of punitive damages to a woman whom the defendant infected with genital herpes. *Loveridge* noted that under the common law, punitive damages, as material here, could only be recovered if

---

[10] As one treatise notes, by enacting the new statute, our legislature places Wisconsin "among the states having the most stringent punitive damage conduct requirements." Richard L. Blatt, et al., Punitive Damages: A State-by-State Guide to Law and Practice § 8.59, at 546 (2003).

the defendant knows, or should have reason to know, not only that his conduct creates an unreasonable risk of harm, but also that there is a strong probability, although not a substantial certainty, that the harm will result but, nevertheless, he proceeds with his conduct in reckless or conscious disregard of the consequences.

*Id.* at 188 (citation omitted). The supreme court held that punitive damages could not be recovered because there was

no credible evidence in the record to support the conclusion that Chartier subjectively intended to injure or harm Loveridge. [The *Loveridge* court] also held that a reasonable person in Chartier's position would not believe that his sexual contact with Loveridge was substantially certain to result in injury or harm to Loveridge.

*Id.* at 189. Moreover, there was no evidence that the "defendant knew or should have known that his or her conduct created an unreasonable and strong probability of harm." *Id.* at 191 (citation omitted). Thus, although the defendant in *Loveridge* volitionally did something that caused the plaintiff to get herpes from him, the supreme court held that punitive damages could not be recovered. In the instant appeal, plaintiffs' counsel indicated that in his view of § 895.85(3), punitive damages under the *Loveridge* scenario *could be recovered:*

[PANEL MEMBER]: Would you say in *Loveridge,* the young man disregarded the rights of the young woman?

[PLAINTIFFS' COUNSEL]: Yes.

[PANEL MEMBER]: So under *Loveridge,* under the new statute, there would be punitive damage coverage?

[PLAINTIFFS' COUNSEL]: Yes. You can have punitive — You obviously —

[PANEL MEMBER]: But there wasn't punitive damage coverage under the old law. So you're saying that there's more coverage under the new law than the old law?

[PLAINTIFFS' COUNSEL]: No, I'm not. I'm saying under the new law, there is no requirement that you have to show that the actor intended bodily harm in a bodily injury case or property right harm in a property injury case because that makes the second clause a nullity and superfluous, and the cases have not said that.

[PANEL MEMBER]: No. I think you just put your finger on the crux, because under your reading of 895.85, there would be punitive damages under *Loveridge*, but under the common law, there is no punitive damages under *Loveridge*. Therefore, an expansion of the scope of punitive damages rather than a restriction of the scope of punitive damages.

Although plaintiffs' counsel attempted to deny the effects of his interpretation, he was unsuccessful. His interpretation of the statute, both under the facts of *Loveridge* and under the facts here, would expand the scope of punitive damages awards in clear contravention to the intent of the legislature when it enacted § 895.85(3). If punitive damages would be awarded under his interpretation of the statute in a case where punitive damages were not appropriate under the common law, then his interpretation would not "heighten the standard for recovery of punitive damages." *Boomsma*, 202 F. Supp. 2d at 880. Rather, it would lower the standard.

667

¶ 43. The dissent's analysis of the statute is unreasonable and would lead to absurd results. After conceding that the legislature intended to heighten the standard for punitive damages, it disregards the consequences of that action. Based on that disregard, the dissent goes on to explain why there is no need to bring an intent to harm element into the statute. If the dissent's interpretation is correct, instead of narrowing the scope of punitive damages with the enactment of WIS. STAT. § 895.85(3), the legislature has not only opened the door wider, but knocked down the entire wall. If we apply the dissent's interpretation, practically any ordinary negligence case will permit an award of punitive damages. Under the dissent's interpretation, anyone who is negligent could be considered to be intentionally disregarding the rights of someone. Examples are numerous: someone who is drinking a cup of coffee while driving, or eating while driving, or adjusting the radio while driving, or even driving over the speed limit. In each of these examples, an injured plaintiff could argue that the tortfeasor driver intentionally disregarded the rights of the other drivers on the road, and thus justify a punitive damage award. Such an interpretation is simply illogical. The only reasonable interpretation of § 895.85(3) is to apply the definition of "intentional" used within the statute as the legislature instructed. Thus, the statute requires both an intent to do an act *and* an intent that harm will result or knowledge that harm is practically certain to result. We are not adding words to the language of the statute; we are simply applying it as the legislature intended.[11]

---

[11] We also comment briefly on the dissent's criticism regarding ascertaining the meaning of legislative intent in the face of

¶ 44. Based on the foregoing, we hold that the trial court's interpretation of the statute was erroneous. The correct interpretation demands that the phrase "intentional disregard of the rights of the plaintiff" be defined to mean either that the actor intended to cause the accident or injury *or* the actor was practically certain that his conduct could result in accident or injury.

¶ 45. Having reached this conclusion, we must also conclude that the trial court erred in submitting the punitive damages issue to the jury. The trial court specifically ruled, and the plaintiffs agreed, that there was no evidence that the defendants intended to harm the decedents or that the defendant knew their conduct was practically certain to result in injury. The plaintiffs, through counsel, conceded that the evidence does not rise to the level of intent to harm. Specifically, in his brief to this court, plaintiffs' counsel admits: "[T]here is no evidence to permit a conclusion that the [Mitsubishi] employees intended to cause bodily injury to the decedents or that they knew or should have known that bodily injury to the decedents was substantially certain to follow."

---

an unambiguous statute. The law clearly states that in construing a statute, our role is to determine the intent of the legislature. This occurs regardless of whether the statute is ambiguous or not. In reviewing a statute, our goal is to "take a comprehensive view toward discerning legislative intent." *State v. Peters*, 2003 WI 88, ¶ 34, 263 Wis. 2d 475, 664 N.W.2d 171 (Abrahamson, C.J., concurring). The Chief Justice of our supreme court has repeatedly called our attention to this rule in recent opinions from that court. *See, e.g., id., State v. Byers*, 2003 WI 86, ¶ 50, 263 Wis. 2d 113, 665 N.W.2d 729 (Abrahamson, C.J., concurring); *see also Bruno v. Milwaukee County*, 2003 WI 28, ¶ 18, 260 Wis. 2d 633, 660 N.W.2d 656 (disagreement as to the plain meaning of a statute does not make it ambiguous).

¶ 46. Accordingly, because it is undisputed that the record does not contain any evidence to support a specific intent to harm or knowledge that Mitsubishi's conduct was practically certain to result in harm, we must reverse the judgment pertaining to punitive damages. The issue should not have been submitted to the jury because there was insufficient evidence to send a punitive damages question to the fact-finder. Accordingly, the punitive damages award of $94,000,000 is hereby vacated.

¶ 47. Based on our disposition, it is not necessary for us to decide any of the other issues raised. The plaintiffs retain the $27,000,000, which has already been paid. The case does not need to be retried because the evidentiary and insurance issues are now moot. Therefore, we decline to address the merits of any of the other issues raised in this appeal.

*By the Court.*—Judgments and orders affirmed in part; reversed in part.

¶ 48. FINE, J. *(concurring)*. I fully join in Judge Wedemeyer's opinion. I wish to add a few words, however, about what I believe has been a general transformation of punitive damages from a useful social tool into something filled with the seeds of dangerous, albeit unintended, consequences. None of my comments has influenced my decision in this matter; as the Majority opinion explains, the recovery of punitive damages in these cases is barred by WIS. STAT. § 895.85, and as judges on an intermediate appellate court we are bound by the law given to us by the Wisconsin Supreme Court, the legislature, and, on matters of federal-constitutional interpretation, the United States Supreme Court.

670

¶ 49. Punitive damages, as the term denotes, are designed to punish and deter egregious anti-social conduct. Indeed, under the Wisconsin Supreme Court's most recent analysis, punishment and deterrence are the *only* purposes for which punitive damages may be awarded in this state. *Trinity Evangelical Lutheran Church v. Tower Ins. Co.*, 2003 WI 46, ¶ 50, 261 Wis. 2d 333, 355, 661 N.W.2d 789, 799 ("[T]he purpose of punitive damages is to punish the wrongdoer, and to deter the wrongdoer and others from similar conduct, rather than to compensate the plaintiff for any loss.").

¶ 50. Until the Wisconsin legislature enacted WIS. STAT. § 895.85, the right to recover punitive damages was created and shaped wholly by judges in this state, and not by the legislature. Punitive damages were designed to be a "quasi-criminal" way to punish conduct that would otherwise go unpunished. *Kink v. Combs*, 28 Wis. 2d 65, 80, 135 N.W.2d 789, 798 (1965).

> Suffice it to say that whatever shortcomings the award of punitive damages may have, nevertheless, it must be remembered that it has the effect of bringing to punishment types of conduct that though oppressive and hurtful to the individual almost invariably go unpunished by the public prosecutor.

*Ibid.* Thus, punitive damages are similar to and supplement the criminal law. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. ___, 123 S. Ct. 1513, 1520 (2003) (punitive-damage "awards serve the same purposes as criminal penalties"). To be effective, however, they must, as one case colorfully noted, be sufficiently painful to "sting." *Gianoli v. Pfleiderer*, 209 Wis. 2d 509, 531, 563 N.W.2d 562, 570 (Ct. App. 1997). In the early days, if "A" hurt "B" by conduct that was sufficiently egregious to warrant an award of punitive damages, assessment

671

of punitive damages against "A" would not only punish "A" but would also deter "A" and others like "A" from doing it again.

¶ 51. Circumstances have changed, however, from an "A" versus "B" situation to one where the harm sought to be punished by punitive damages may have been caused by an employee or employees of large corporations. At first blush, it may seem that "large corporations" are fair game. First, many persons have a "prejudice against large corporations," especially if they are from out of town. *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 464 (1993) (Stevens, J., for a plurality of the Court and announcing its judgment). Second, large corporations are seen as golden-eggs-laden geese from which there is an endless supply of "free money." This is a dangerous myth unsupported by economic realities; just as there is no "free lunch," there is no "free money"—the money has to come from someone, and, in the case of large corporations, it comes from employees, shareholders, and customers.

¶ 52. Unlike small, closely held corporations, sole proprietorships, or small partnerships, large corporations are generally far-flung businesses employing thousands or tens of thousands of employees. These businesses, so vital to our economy, are owned not by the managers who control what the corporations do, but by shareholders who, with rare exceptions, have *no* control over either those managers or corporate policy. And these corporations are not living creatures that can be punished like a person can be punished; they cannot be sent to prison. Subjecting corporations to draconian criminal or criminal-like penalties, hurts *only* their employees, shareholders, and customers. Thus, by one estimate, the criminal prosecution of the large public-accounting firm Arthur Andersen cost 80,000 employ-

672

ees their jobs, all but a few of whom were not guilty of anything related to the firm's prosecution.[1] Imposition of punitive damages can have similar life-derailing consequences for those innocent of *any* wrongdoing, because, to repeat, when corporations are forced to pay punitive damages most of the pain falls on employees, shareholders, and customers. Indeed, often the culpable employee escapes any punishment.

¶ 53. I recognize that the Wisconsin Supreme Court has said that all of this is OK by ruling, without supporting economic data or analysis, that it is unlikely for a corporation to be able to pass to consumers punitive-damages-related increased costs, and, also, that it is not unfair to force shareholders to pay penalties flowing from punitive-damages awards. *Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 287–288, 291, 294 N.W.2d 437, 452, 453 (1980) ("But the loss of investment and the decline in value of investments are risks which investors knowingly undertake, and investors should not enjoy ill-gotten gains."). I respectfully disagree. Although *Wangen*'s assessment of the equities is logical in the abstract, consequences of punitive-damages awards can be malignant in practice. Oliver Wendell Holmes, Jr., once presciently observed: "The life of the law has not been logic: it has been experience." OLIVER WENDELL HOLMES, JR., THE COMMON LAW 1 (1881). Experience tells us that something is terribly wrong when the sting of "quasi-criminal" punitive damages falls on innocent employees, shareholders, customers, and, in

---

[1] Interview with Samuel A. DiPiazza, Global Chief Executive Officer, PricewaterhouseCoopers, *at* http://www.pwcglobal.com /ru/eng/ins-sol/issues/03–07–08_sd_ve.html (last visited Aug. 26, 2003).

some cases, taxpayers. *Wangen*, 97 Wis. 2d at 327, 294 N.W.2d at 470–471 (Coffey, J., dissenting).[2]

¶ 54. But punitive-damages awards are loved by personal-injury lawyers, and judges are thus reluctant to staunch their flow. Indeed, *Wangen* conceded that punitive-damages awards (ostensibly designed to punish only) are also a back-door way to pay lawyers:

---

[2] There are two categories of persons who will automatically bear the costs of the majority decision, depending on the strength and market position of the manufacturer: (1) the employees and stockholders; or (2) the consumer-taxpayer. If the manufacturer is not in a strong financial position so as to be able to bear these added costs, he will be faced with the threat of being forced out of business or into bankruptcy, thus resulting in a loss of jobs (unemployment) and the curtailment of competition, to the detriment of the consumer. If bankruptcy or the loss of business and jobs is to be avoided, it is the consumer who will ultimately bear the burden of punitive damage awards through the payment of higher prices for the goods in the market place. As the cost of such damages is passed on through higher product prices, the consumer will foot the bill for a penalty imposed for its very own protection. If the consumer does not pay higher prices, as a taxpayer, he will pay for the hidden costs of government with higher taxes for increased welfare, retraining and unemployment programs occasioned by business failures. Moreover, imposition of multiple punitive damage awards could have an adverse impact not only on the manufacturer, Ford, but also those commercial businesses that supply materials for use in construction of cars, such as the producers of automobile locks, tires, catalytic converters, etc. Are we going to further intimidate Wisconsin manufacturers with the threat of high punitive damage awards? The recovery of punitive damages against American businesses resulting in higher product costs obviously magnifies their disadvantage in competition with foreign manufacturers.

*Wangen v. Ford Motor Co.*, 97 Wis. 2d 260, 327, 294 N.W.2d 437, 470–471 (1980) (Coffey, J., dissenting).

674

"[P]ayment of punitive damages to the injured party is justifiable as a practical matter, because such damages do serve to compensate the injured party for uncompensated expenses, *e.g.*, attorneys' fees and litigation expenses, and that the [punitive-damages] windfall motivates reluctant plaintiffs to go forward with their claims." *Id.*, 97 Wis. 2d at 292, 294 N.W.2d at 454.[3]

¶ 55. There is also a roll-of-the-dice aspect to punitive damages; very few persons who are harmed by conduct warranting imposition of punitive damages *ever* get to recover from those who caused the harm even compensatory damages, no less punitive damages. The plaintiffs in this case suffered grievous losses, but, sadly, their pain is not unique to them. Last year in Wisconsin, for example, 164 persons were homicide victims.[4] Nation-wide, the toll was more than 16,100, or, on the average, forty-four *per day*.[5] My guess is that few if any of the families of these victims will receive *anything* from those who killed their loved ones. And then, of course, there are the countless other victims of crime who suffer horrendous injuries short of death.

---

[3] Similarly, "compensatory" but noneconomic damages work "essentially as a pool from which the attorney's fees of personal-injury plaintiffs" are paid. *Guzman v. St. Francis Hosp., Inc.*, 2001 WI App 21, ¶ 5, 240 Wis. 2d 559, 571, 623 N.W.2d 776, 782 (Ct. App. 2000) (upholding statutory cap on noneconomic damages in medical-malpractice cases).

[4] Tom Rybarczyk & Kelly Wells, *Homicides Reported in State at 14-year Low,* Milwaukee J.S., July 1, 2003, *available at* http://www.jsonline.com/news/state/june03/151979.asp (June 30, 2003).

[5] Callie Marie Rennison, Ph.D. & Michael R. Rand, U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Criminal Victimization, 2002, Aug. 2003, NCJ 199994, *available at* http://www.ojp.usdoj.gov/bjs/pub/ascii /cv02.txt (August 13, 2003).

They, too, rarely, if *ever,* receive *any* payment from those who raped or maimed them. These victims, to borrow Horace's poignant words, suffer "unwept, unknown, because they lack a sacred poet." HORACE, 4 Odes ix 1. 25. Our current system of punitive damages is of no help to them.

¶ 56. Courts have recognized the out-of-balance unfairness of huge punitive-damages awards, and have gradually attempted to trim some of the rougher edges. *See Campbell,* 123 S. Ct. at 1527 (Ginsburg, J., dissenting) (collecting cases). This is not enough; tinkering with the engine is useless when that engine is, as I believe it is, in need of an overhaul. As noted, our task as judges on an intermediate appellate court is to apply the law as it is given to us by the legislature and the Wisconsin Supreme Court. Both the Wisconsin Supreme Court, which can only act in the context of cases brought to it by lawyers, and the Wisconsin legislature, which has broad plenary power to make law, should set things right. As Justice Antonin Scalia has observed: "State legislatures and courts have the power to restrict or abolish the common-law practice of punitive damages, and in recent years have increasingly done so." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 39 (1991) (Scalia, J., concurring); *see also BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 614–619 (1996) (Ginsburg, J., dissenting) (table of "State Legislative Activity Regarding Punitive Damages").

¶ 57. We should have a system that punishes the guilty, not the innocent, and, further, punitive damages should not be lottery-like windfalls for a tiny percentage of those who suffer pain inflicted by others.[6]

---

[6] One approach to solving the windfall part of the problem was tried by *Dardinger v. Anthem Blue Cross & Blue Shield,* 781 N.E.2d 121 (Ohio 2002), when it directed that a significant

¶ 58. SCHUDSON, J. (*dissenting*). These appeals present numerous issues and, on the basis of one or more of them, it is possible that the punitive damages award will fall.[1] It also is possible that the Wisconsin Supreme Court, weaving policy considerations into the legal analysis, will interpret WIS. STAT. § 895.85(3) in a manner that precludes or reduces the punitive damages awarded in this case. If it does so, however, it should not embrace the majority's analysis lest it upend fundamental, well-settled principles underlying the essential difference between compensatory and punitive damages.

¶ 59. I write separately, therefore, to explain that WIS. STAT. § 895.85(3): (1) if deemed *unambiguous,* cannot mean what the majority claims; and (2) if deemed *ambiguous,* could mean what the majority claims but, consistent with the logic underlying the

---

portion of the punitive damages awarded be distributed to a cancer hospital and research institute at Ohio State University, even though no statute authorized such a distribution. *Id.*, 781 N.E.2d at 146. *Dardinger* noted, however, that its approach was similar to that authorized by statute in some other states: "Numerous states have formalized through legislation a mechanical means to divide a punitive damages award between the plaintiff and the state. In some states, the state's portion goes to a special fund, in others, to the general fund. Annotation (1993), 16 A.L.R. 5th 129." *Id.*, 781 N.E.2d at 145. I offer no opinion as to whether such an approach or one similar to it should be adopted in Wisconsin; that is an issue for either the legislature following extensive inquiry, or the Wisconsin Supreme Court after briefing and argument.

[1] I mention this, at the outset, not to signal my opinion on any issue we have not yet addressed, but rather, to acknowledge that many substantial issues remain. I would hope, therefore, that if the supreme court embraces my understanding of WIS. STAT. § 895.85(3), it will also address the constitutional challenge to the punitive damages award.

677

difference between compensatory and punitive damages, probably does not. Further, in light of Judge Fine's concurring opinion, I shall comment briefly on the importance of prosecuting corporate officers who try to hide their crimes behind corporate veils.

## I. WISCONSIN STAT. § 895.85(3)

¶ 60. Quite properly, the majority focuses on the words of WIS. STAT. § 895.85(3): "The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff *or in an intentional disregard of the rights of the plaintiff.*" (Emphasis added.) Quite curiously, however, the majority, despite concluding "that the statute is not ambiguous," majority, ¶ 32, embarks on the kind of long, interpretive cruise generally reserved for judicial travelers viewing *ambiguous* statutes.

¶ 61. So, although portions of its analysis are helpful, the majority's statutory discussion, as a whole, is internally inconsistent, confusing and, ultimately, incorrect. Accordingly, if only to advance the discussion of what, no doubt, will call for supreme court review, let me try to re-align the analysis.

### A. WISCONSIN STAT. § 895.85(3)—Unambiguous?

¶ 62. The majority says WIS. STAT. § 895.85(3) is unambiguous. But, in the midst of so much uncertainty in these appeals, perhaps the only certainty is this: if § 895.85(3) is *unambiguous,* it supports the plaintiffs. The analysis is simple and clear.

¶ 63. The statutory words at issue are: "or in an intentional disregard of the rights of the plaintiff." The statute says nothing about "harm" or "injury," inten-

tional or otherwise. And Wis JI—Criminal 1701.1 doesn't either; it elaborates: "A person acts in an intentional disregard of the rights of the plaintiff if the person acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are practically certain to result in the plaintiff's rights being disregarded" (footnote omitted). In this case, the plaintiffs accept the unadorned statutory language; the defendants, and now the majority, do not.

¶ 64. The plaintiffs' premise is, in part, that "rights" under Wis. Stat. § 895.85(3) includes the right to a safe workplace. That part of their premise is unremarkable; the defendants do not dispute it. The plaintiffs' premise, however, also includes the understanding that, under the statute, their right to a safe workplace may be intentionally disregarded, such that punitive damages may be warranted, *regardless of the defendants' intent to cause harm or injury*. They explain:

> Intent to cause physical injury is not necessary to intentionally disregard rights. This case is a perfect example, *where there was a pattern of exposing workers to great risk by knowingly operating in unsafe conditions*. Each time, workers' rights were disregarded, even if no injury occurred. When the decedents were killed, [Mitsubishi's] conduct exposed it to punitive damages under § 895.85(3). There is no basis to say that in a personal injury case, the statute requires an intent to cause physical injury when the statute contains no such distinction, and such intent has not been required in the cases previously decided under § 895.85(3), regardless of the liability theory.

(Emphasis added.)[2] The defendants disagree; they contend that for the right to a safe workplace to be disregarded, harm or injury must be intended.

¶ 65. Clearly, *if* the statute is *unambiguous*, the defendants are wrong. Their position would require the addition of essential words: "with intent to cause harm or injury." The majority simply does not explain where it has located those missing words or how it can graft them to the statute. Thus, if the majority is correct in concluding that WIS. STAT. § 895.85(3) is *unambiguous*, the plaintiffs' statutory argument prevails.

## B. WISCONSIN STAT. § 895.85(3)—Ambiguous?

¶ 66. If, as the defendants contend, "with intent to cause harm or injury" must be grafted to the statute, it could only be because "rights" is ambiguous and courts, interpreting far beyond the face of the statute, say it must be so. So let us consider that and, in doing so, let me try to locate the best theory I can to support the majority's view. And then let us see if the theory holds.

¶ 67. The majority relies on jury instructions and a note to one of them. Here, the majority finds some support (but not quite where the majority leans).

¶ 68. First, the majority points out that Note 2 to WIS JI—CIVIL 1707.1 declares that the statute "was

---

[2] I add emphasis to "where there was a pattern of exposing workers to great risk by knowingly operating in unsafe conditions" because the majority, in its factual summary, fails to acknowledge that this *pattern* was critical to the plaintiffs' proof. *See* majority, ¶ 34. Instead, the majority concentrates on the factual allegations relating to Mitsubishi's conduct on the fateful day. *See id.* The particulars of that day, however, comprised only the last chapter of the tragedy. Standing alone, the events of that final day constitute an incomplete account of the evidence the jury apparently found so compelling.

clearly intended to be more narrow than the case law standard." But that does not advance the analysis of the parties' dispute. After all, no one is contending that the statute fails to do that. All agree that the statute has tightened the standard for establishing "intentional disregard." *The issue, however, is whether, somehow, the intentional disregarding of "rights" necessarily includes the intent to cause harm or injury.*

¶ 69. Second, and far more helpfully, the majority notes that WIS JI—CIVIL 2001 defines "intent" in a way that carves away negligence by explaining that if a defendant's conduct "merely created a risk of some harm to someone, which may or may not have resulted, then (defendant)'s conduct was negligent as opposed to intentional." That, then, may set the foundation for the syllogism essential to the defendants' position: (1) WIS. STAT. § 895.85(3) requires an "intentional" act; (2) WIS JI—CIVIL 2001 provides that creating "risk," without intending "harm," is negligent, not intentional; and, therefore (3) the intentional disregarding of rights, under § 895.85(3), necessarily includes intending "harm."

¶ 70. So what's the problem? Well, in the first place, this is the only authority the majority can locate for its grafting. This single, tangentially-related jury instruction is, I think, a terribly thin thread from which to hang the full, framed portrait of punitive damages. And, in the second place, the majority's theory— interpretively adding "with intent to cause harm or injury" to the statute—makes little sense. To add these words is to obliterate the most fundamental difference between compensatory and punitive damages. Let's examine that.

¶ 71. The majority maintains that the evolution from the common law to the 1995 statute supports the

defendants' position. But that begs the obvious question: If the legislature, in addition to tightening the standard, also wanted to require intended "harm" or "injury," why didn't it say so? Why didn't the legislature add the simple words, "with intent to cause harm or injury"? As the parties explained to this court, the legislative history does not answer. It seems, however, that law and logic do.

¶ 72. Law, addressing "harm" or "injury," enters the realm of *compensatory* damages, and does so regardless of intent. But law, addressing the "intentional disregarding of rights," *see* WIS. STAT. § 895.85(3), points directly at a defendant's *conduct.* And where Wisconsin law provides the statutory potential for punitive damages to deter dangerous conduct, it does so with *some* regard for intent and the extent of the resulting harm or injury, *but it also preserves the potential for punitive damages even in the absence of all but nominal harm or injury.*[3]

¶ 73. Any possible doubt about that was recently erased in *Trinity Evangelical Lutheran Church v. Tower Insurance Co.*, 2003 WI 46, 261 Wis. 2d 333, 661 N.W.2d 789. In *Trinity*, the supreme court reiterated:

> The factors necessary for an award of punitive damages[ ] require a showing of: (1) evil intent deserving of punishment or of something in the nature of special ill-will; or (2) wanton disregard of duty; or (3) gross or outrageous conduct.

---

[3] *See Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 393, 541 N.W.2d 753 (1995) ("Wisconsin does not allow punitive damages to be awarded in the absence of an award of actual damages."); *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997) (nominal damages will suffice if a legal right has been violated).

Punitive damages may properly be imposed to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition.

*Id.*, ¶¶ 45–46 (citations omitted). *The supreme court did not add any "with-intent-to-cause-harm-or-injury" element.* The state's "legitimate interests in punishing unlawful conduct and deterring its repetition," *id.*, ¶ 46, remain solidly in place *regardless* of whether a defendant intends harm or injury to result from the disregarding of rights.

¶ 74. Were this not enough, the supreme court, in *Trinity*, quoted, with approval, a punitive damages jury instruction that explicitly provides, "Punitive damages may be awarded, if you find that the defendant acted in an intentional disregard of the rights of the plaintiff." *Id.*, ¶ 45 n.5. It made no mention of intending harm or injury. The instruction then goes on to explain that "[p]unitive damages *are not awarded to compensate the plaintiff for any loss he or she has sustained." Id.* (emphasis added). Then, most definitively, the instruction absolutely separates the jury's determination of *whether* punitive damages should be awarded (regardless of intended harm of injury), from *how much* should be awarded (taking harm or injury—actual *and potential*—into consideration):

*If* you determine that punitive damages should be awarded, you may then award such sum as will accomplish the purpose of punishing or deterring wrongful conduct.

Factors you should consider in answering this question include:

1. The grievousness of the defendant's acts,

2. The potential damage which might have been

683

done by such acts as well as the actual damage, and

3. The defendant's ability to pay . . . .
*Id.* (emphases added).

¶ 75. The message could not be more clear: (1) Punitive damages are intended to punish unlawful conduct and deter its repetition. *Id.*, ¶ 46. (2) Punitive damages serve those purposes regardless of intended harm or injury. *Id.*, ¶¶ 45–46. (3) Punitive damages may be awarded in recognition of "the *potential damage* which *might* have been done by such acts." *Id.*, ¶ 45 n.5 (emphasis added). (4) The amount of punitive damages may increase if "actual damage" has resulted. *Id.*[4]

¶ 76. And indeed, how could it be otherwise? The separation between compensatory and punitive damages, and the potential for punitive damages even in the absence of intended harm or injury, are at the foundation of our common law. In 1763, in one of the seminal cases allowing punitive damages, Lord Chief Justice Sir

---

[4] Other recent Wisconsin decisions support the same proposition. *See, e.g., Dorr v. Sacred Heart Hosp.*, 228 Wis. 2d 425, 454–55, 597 N.W.2d 462 (Ct. App. 1999) (*without any reference to harm or injury,* concludes that, under Wis. Stat. § 895.85(3), for purposes of summary judgment analysis, intentional disregard of plaintiffs' right to be free from hospital's improper lien can establish the basis for punitive damages claim); *Allied Processors, Inc. v. Western Nat'l Mut. Ins. Co.*, 2001 WI App 129, ¶ 38, 246 Wis. 2d 579, 629 N.W.2d 329 (*without any reference to harm or injury,* concludes that, under Wis. Stat. § 895.85(3), for purposes of measuring the sufficiency of evidence to support a jury's punitive damages verdict, intentional disregard of plaintiff's rights to disclosure of accurate insurance coverage information, proper evaluation of punitive damages claim, and proper claim settlement in order to prevent an excess verdict, can establish the basis for punitive damages award).

Charles Pratt declared that juries have the "power to give *damages for more than the injury received* . . . as a punishment to the guilty, to deter from any such proceeding for the future, and as a proof of the detestation of the jury *to the action itself.*" *Wilkes v. Wood*, 98 Eng. Rep. 489, 498–99 (C.P. 1763) (emphases added).

¶ 77. Early American courts soon echoed the *Wilkes* principles. The New Jersey Supreme Court, for example, in 1791, approved a jury instruction that emphasized that, in determining punitive damages, the jury was "*not to estimate the damages by any particular proof of suffering or actual loss;* but to give damages for *example's* sake, to prevent such offenses in [the] future." *Coryell v. Colbaugh*, 1 N.J.L. 77, 77 (1791) (first emphasis added). The *Wilkes* principles remain solid. Lest any doubt linger, the United States Supreme Court recently reiterated that while compensatory damages flow from a jury's factual determinations of actual loss, punitive damages are "an expression of [the jury's] moral condemnation." *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001).

¶ 78. Thus, I conclude, the majority's attempt to graft a "with-intent-to-cause-harm-or-injury" element to WIS. STAT. § 895.85(3) violates the traditional distinction between compensatory and punitive damages—a distinction that removes "harm" or "injury" from a jury's initial determination of *whether* punitive damages are warranted and, under Wisconsin law, relegates the intent and extent of any harm or injury to the criteria affecting a jury's subsequent determination of *how much* should be awarded. *See Trinity*, 261 Wis. 2d 333, ¶ 45. From *Wilkes* to *Trinity*, from 1761 to 2003, the separation is certain; the grafting cannot hold.

### C. The Bottom Line—Wɪs. Sᴛᴀᴛ. § 895.85(3)— Unambiguous or Ambiguous

¶ 79. In short, whether simply following the course of what appears to be an unambiguous statute, or interpretively traveling through Wɪs. Sᴛᴀᴛ. § 895.85(3), we arrive at the same destination. The legislature did indeed tighten the standard for punitive damages; at the same time, however, the legislature maintained the critical distinction between compensatory and punitive damages. Thus, consistent with that distinction and the traditional, sound public policy it embodies, the statute preserves the *potential* for punitive damages in a case where a defendant intentionally disregards rights by creating an unsafe workplace, regardless of whether the defendant intended any harm or injury to result.

### II. Corporate Responsibility

¶ 80. Judge Fine's concurring opinion could call for extensive, additional discussion. Here, however, I offer only a few thoughts.

¶ 81. Most helpfully, Judge Fine's comments can help courts shed the polemics often included in arguments about corporate responsibility. It is safe to say, I think, that corporations are neither as demonic nor angelic as their critics and apologists claim. And corporations, I think, do not fall neatly into any political category. After all, we all have seen corporate conduct liberals applaud as well as corporate misconduct conservatives condemn.

¶ 82. Corporations, I suspect, often are as good or bad, constructive or destructive, as the individuals directing their affairs. Some corporate leaders reach the

right balance. Carefully attending to both community responsibility and shareholder return, they recognize that healthy communities are good for business, and good businesses help make healthy communities. Other corporate leaders, however, lose their way. They cut corners, carelessly cut jobs, give-in to greed, and break laws.

¶ 83. When that occurs, as Judge Fine points out, firing a shotgun at "the corporation" may wound the innocent. Thus, carefully aimed criminal prosecution of individual corporate officers becomes all the more important. Thorough investigation and tenacious prosecution can help protect our communities from criminals who would try to hide behind their corporate veils.[5]

---

[5] For a discussion of the importance of criminal prosecution of individual, corporate officers, *see* Charles B. Schudson, et al., *Nailing An Omelet to the Wall: Prosecuting Nursing Home Homicide,* in CORPORATIONS AS CRIMINALS—PERSPECTIVES IN CRIMINAL JUSTICE 6, 131, 134–36 (Ellen Hochstedler, ed., 1984).